591 S.E.2d 646

**The STATE, Respondent,**

v.

**Charles PAGAN, Appellant.**

**No. 3724.**

Court of Appeals of South Carolina.

Heard Dec. 9, 2003.

Decided Jan. 12, 2004.

Deputy Chief Attorney, Joseph L. Savitz, III, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka and Assistant Attorney General, S. Creighton Waters, all of Columbia; and Solicitor Edgar L. Clements, III, of Florence, for Respondent.

ANDERSON, J.:

Charles Pagan was convicted of murder and sentenced to life imprisonment. Pagan appeals, arguing the trial judge erred in allowing testimony from an individual about an incident that occurred more than one year after the victim's murder. We affirm.

## *FACTS/PROCEDURAL BACKGROUND*

At approximately 8:00 a.m. on December 11, 1997, the victim's body was discovered in a vacant lot in Florence, South Carolina. DNA testing revealed there was semen on the victim's pants and in her vagina. Dr. Edward Proctor, the forensic pathologist who performed the autopsy, concluded the victim died as a result of "massive blunt force injury to the head," likely caused by multiple blows from a heavy object, such as a board.

Steven[1] Blathers, an acquaintance of the victim, lived across the street from the vacant lot where the body was found.

---

1. In the record and Respondent's brief, "Steven" is spelled with a "v." In the Appellant's brief, his name is written as "Stephen."

After DNA testing, it was determined that the semen found on the victim belonged to Blathers. Blathers admitted to having sex with the victim in exchange for providing her with crack cocaine. However, Blathers was not viewed as a suspect because his mother attested he was home at the approximate time the victim was attacked. Additionally, Jessie Jones, a neighbor of Blathers who lived in front of the vacant lot, saw the victim fighting with a man that night and testified Blathers did not match the description of that individual. The following colloquy occurred during direct examination of Jones:

Q. How tall is Mr. Steve Blathers?

A. About five foot if he that. He was short.

Q. You didn't see Steve Blathers out there by that school bus at the fight, didn't you?

A. Not that I can say for sure, no.

Q. Well, that fellow you described is six feet light-skinned wasn't Steve Blathers?

A. No.

Q. And you didn't see Steve Blathers around there, didn't you?

A. No, I didn't. Because I couldn't recognize none of them.

Jones stated that, around 2:00 a.m. the morning of the murder, he observed a group of people hitting a sign with a stick outside of his house. Thereafter, Jones noticed a "tall man" and a "lady [who] was kind of short" arguing and "hitting each other with sticks." Another neighbor, Patrice Washington, said that, at approximately 2:10 a.m., she witnessed a "shadow run pas[t] [her] window," followed by "two more shadows." Washington declared "[t]he first shadow was screaming." Sometime after 2:00 a.m., Blathers looked out the door of his house and saw a six-foot tall "shadow run across the street" with "something in [his] hand."

Monique Ellerbee Cooks [2] called Crime Stoppers the night the victim's body was discovered. Cooks informed Crime

---

2. The record refers to "Monique Ellerbee Cooks." In the Appellant's brief, her name is written as "Monique Cooks." The Respondent's brief states her name as "Monique Ellerby."

138

Stoppers that she was with the victim at a club on the night of the murder. Cooks claimed the victim left the club with a man and that Cooks did not see the victim again. Cooks gave a detailed description of the man. When police visited Cooks, she reiterated that she had been with the victim the night she was killed but did not tell the police that she had witnessed the murder. Cooks failed to point out anyone in three photographic lineups, one of which included Pagan.

Cooks later assisted police in drawing a composite sketch of the man she saw with the victim the night of the murder. Police interviewed Pagan after an individual identified him from the composite sketch. Police then re-interviewed Cooks, who identified Pagan in a photographic lineup as the person she saw with the victim the night of the murder. Cooks indicated that she had recognized Pagan the first time she viewed the lineup but that "she was scared to point him out" at that time.

Approximately one month later, Cooks professed that she witnessed the murder. On the night the victim was killed, Cooks followed the victim, who was walking with a man that Cooks had never seen before. Cooks heard the victim arguing with the man about money and drugs. Speaking in an angry tone, the man asked the victim for the twenty dollars she owed him. While standing in the area where Jessie Jones stated he had seen people hitting a sign, Cooks watched the man and victim "hitting each other with sticks." The man told the victim, "Bitch, you gone give me my money." When the victim ran, the man chased the victim and beat her in the face and head with a board. Cooks screamed. The man told Cooks that he was going to "get [her] next." Cooks identified Pagan as the victim's attacker.

Police issued an arrest warrant for Pagan on January 15, 1998. Pagan fled to New Jersey but was apprehended on February 20, 1998.

In February 1999, more than one year after the murder, Pagan was arrested while out on bond. The arrest was based upon a statement given by Tamika Lambert. Lambert stated she was the passenger in a vehicle being driven by someone named "Derrick" when a police car with its blue light on attempted to pull them over. According to Lambert, "Der-

rick" drove off at a high speed, crashed the car, and ran away. When Lambert saw "Derrick" several hours later, "Derrick" apologized to her and explained why he ran from the police. Lambert declared:

> He start[ed] out telling me that he couldn't stop because he didn't have no [driver's] license. Then he told me that he was on—I'm trying to see which one he told me first. He was on a $100,000 bond because they had—[t]his girl—[t]hey accused him of killing some girl. And it was all because of some girl named Monica.

Lambert identified Pagan as the man who (1) told her his name was "Derrick"; (2) ran from the police; (3) wrecked the car; and (4) later explained to her why he had run from the police. The car that Pagan wrecked after the chase was registered to Pagan's wife. Pagan denied both knowing Lambert and wrecking his wife's car.

Before Lambert testified at trial, defense counsel objected to her testimony, claiming the evidence was unduly prejudicial and too remote in time to be considered in conjunction with the murder charge. The trial court overruled the objection, finding Lambert's testimony was admissible under Rule 404(b), SCRE, as Monique Ellerbee Cooks said she'd been threatened and Lambert's testimony referred to Pagan's comment that a girl named "Monica" was the cause of his problems. Defense counsel unsuccessfully renewed this objection after Lambert testified. In charging the jury, the trial judge instructed that Lambert's testimony was admissible only as to identification.

The jury found Pagan guilty of murder. He was sentenced to life imprisonment.

### *LAW/ANALYSIS*

Pagan contends the trial judge erred in admitting Tamika Lambert's testimony. Specifically, Pagan claims Lambert's testimony that Pagan ran from police while out on bond for this murder charge was only slightly relevant, yet highly prejudicial. We disagree.

## I.   Evidence of Flight

"Flight from prosecution is admissible as evidence of guilt." *State v. Al–Amin,* 353 S.C. 405, 413, 578 S.E.2d 32, 36–37 (Ct.App.2003); *see also State v. Ballenger,* 322 S.C. 196, 200, 470 S.E.2d 851, 854 (1996) (stating flight is "at least some evidence" of defendant's guilt); *State v. Freely,* 105 S.C. 243, 89 S.E. 643 (1916) (declaring the flight of one charged with crime has always been held to be some evidence tending to prove guilt).   Evidence of flight has been held to constitute evidence of defendant's guilty knowledge and intent.   *See State v. Beckham,* 334 S.C. 302, 513 S.E.2d 606 (1999); *Town of Hartsville v. Munger,* 93 S.C. 527, 77 S.E. 219 (1913); *State v. Brownlee,* 318 S.C. 34, 455 S.E.2d 704 (Ct.App.1995); *see also State v. Thompson,* 278 S.C. 1, 292 S.E.2d 581 (1982), *overruled on other grounds by State v. Torrence,* 305 S.C. 45, 406 S.E.2d 315 (1991) (finding evidence of flight admissible to show guilty knowledge, intent, and that defendant sought to avoid apprehension); *State v. Grant,* 275 S.C. 404, 407, 272 S.E.2d 169, 171 (1980) ("[A]ttempts to run away have always been regarded as some evidence of guilty knowledge and intent.") (internal quotation marks omitted); *State v. Davis,* 354 S.C. 348, 580 S.E.2d 778 (Ct.App.2003) (noting that circumstances of defendant's flight from police after they attempted traffic stop allowed reasonable inference of guilty conduct).   Flight, when unexplained, is admissible as indicating consciousness of guilt, for it is not to be supposed that one who is innocent and conscious of that fact would flee.   *See State v. Williams,* 350 S.C. 172, 564 S.E.2d 688 (Ct.App.2002) (citing 29 Am.Jur.2d *Evidence* § 532 (1994)).

The critical factor to the admissibility of evidence of flight is whether the totality of the evidence creates an inference that the defendant had knowledge that he was being sought by the authorities.   *Beckham,* 334 S.C. at 315, 513 S.E.2d at 612.   It is sufficient that circumstances justify an inference that the accused's actions were motivated as a result of his belief that police officers were aware of his wrongdoing and were seeking him for that purpose.   *Id.* (citing *Commonwealth v. Jones,* 457 Pa. 563, 319 A.2d 142 (1974)).   Flight or evasion of arrest is a circumstance to go to the jury.   *See Beckham,* 334 S.C. at 315, 513 S.E.2d at 612; *State v. Turnage,* 107 S.C. 478, 93 S.E. 182 (1917); *see also State v. Byers,*

277 S.C. 176, 284 S.E.2d 360 (1981) (recognizing that evidence of flight is proper and that it is oftentimes appropriate for counsel to argue to the jury the inferences growing out of flight); *Grant*, 275 S.C. at 408, 272 S.E.2d at 171 (stating that while a jury charge on flight as evidence of guilt is improper, admission of evidence and argument by counsel concerning it are allowed).

■ Tamika Lambert's testimony was clearly admissible for the purposes of proving Pagan's flight and "guilty knowledge." After failing to stop for a blue light, evading police, and leaving the scene of the accident, Pagan told Lambert he was out on bond "because they . . . accused him of killing some girl," and that he was in trouble because of a girl named "Monica." As such, Lambert's testimony was admissible for proving: (1) Pagan was attempting to avoid capture and violate his bond provisions for the murder charged in the instant case and (2) Pagan could identify the very person, Monique Ellerbee Cooks, who was the key witness in the case. A jury could have easily inferred knowledge of Pagan's guilt from these actions.

In *State v. Beckham*, the defendant left for a vacation in Florida several hours before a warrant was issued for his arrest. After spending one hour in a Florida hotel, defendant then drove all night to Kentucky. Our Supreme Court held this was admissible as flight evidence and was properly submitted to the jury. *Beckham*, 334 S.C. at 315, 513 S.E.2d at 612–13. Similarly, in *State v. Al–Amin*, the defendant fled the scene after dumping the victim's body in a dumpster next to his apartment. This Court found evidence of the defendant's flight was circumstantial evidence to be submitted to the jury. *Al–Amin*, 353 S.C. at 413, 578 S.E.2d at 36–37.

Pagan cites *McFadden v. State*, 342 S.C. 637, 539 S.E.2d 391 (2000), in his brief for the proposition that Tamika Lambert's testimony was not admissible as evidence of flight because the police were "not at that point pursuing [Pagan] as a suspect in the earlier murder." However, *McFadden* is clearly inapposite as it concerns the rule that, in a trial *in absentia*, the jury cannot consider the defendant's absence at trial as evidence of defendant's guilt. *McFadden*, 342 S.C. at 644–45, 539 S.E.2d at 395.

Concomitantly, we find Tamika Lambert's testimony was properly admitted as flight or "guilty knowledge" evidence.

## II. Corroboration Evidence

All relevant evidence is admissible. *State v. Saltz*, 346 S.C. 114, 551 S.E.2d 240 (2001); *State v. Aleksey*, 343 S.C. 20, 538 S.E.2d 248 (2000); *State v. Adams*, 354 S.C. 361, 580 S.E.2d 785 (Ct.App.2003); Rule 402, SCRE. "Relevant evidence" is defined as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. *State v. Shuler*, 353 S.C. 176, 577 S.E.2d 438 (2003); *State v. Braxton*, 343 S.C. 629, 541 S.E.2d 833 (2001); *State v. Hamilton*, 344 S.C. 344, 543 S.E.2d 586 (Ct.App.2001); Rule 401, SCRE. Under Rule 401, evidence is relevant if it has a direct bearing upon and tends to establish or make more or less probable the matter in controversy. *In re Corley*, 353 S.C. 202, 577 S.E.2d 451 (2003); *Adams*, 354 S.C. at 378, 580 S.E.2d at 794; *State v. King*, 349 S.C. 142, 561 S.E.2d 640 (Ct.App.2002).

As the only eyewitness able to identify Pagan as the victim's killer, Monique Ellerbee Cooks's credibility was of utmost importance. Cooks was not entirely forthcoming in her first few meetings with investigators, which might have adversely affected the veracity of her testimony. We find Lambert's testimony about Pagan's comments after he fled from police was relevant in corroborating Cooks's testimony. Lambert declared that Pagan told her he was out on bond "because they . . . accused him of killing some girl," and he blamed this trouble on someone named "Monica." This corroborates Cooks's testimony in two respects: (1) that she was an eyewitness to the crime and (2) that Pagan knew her identity. Similarly, Lambert's testimony corroborates Cooks's statement that she was afraid of Pagan, and that he said he would "get [her] next."

Consequently, Tamika Lambert's testimony was properly admitted as corroboration evidence, as it supported Cooks's testimony.

### III. Identity Under Rule 404(b)

Generally, South Carolina law precludes evidence of a defendant's prior crimes or other bad acts to prove the defendant's guilt for the crime charged. *State v. Weaverling*, 337 S.C. 460, 523 S.E.2d 787 (Ct.App.1999); *see also State v. Beck*, 342 S.C. 129, 536 S.E.2d 679 (2000) (finding that evidence of prior crimes or bad acts is inadmissible to prove bad character of defendant or that he acted in conformity therewith). Such evidence is admissible, however, when it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the proof of the other; or (5) the identity of the person charged with the present crime. *See State v. Lyle*, 125 S.C. 406, 118 S.E. 803 (1923); Rule 404(b), SCRE; *see also Anderson v. State*, 354 S.C. 431, 581 S.E.2d 834 (2003) (explaining that Rule 404, the modern expression of the *Lyle* rule, excludes evidence of other crimes, wrongs, or acts offered to prove character of person in order to show action in conformity therewith; the rule creates an exception when testimony is offered to show motive, identity, existence of common scheme or plan, absence of mistake or accident, or intent). If there is any evidence to support the admission of bad act evidence, the trial judge's ruling will not be disturbed on appeal. *State v. Wilson*, 345 S.C. 1, 545 S.E.2d 827 (2001).

The bad act must logically relate to the crime with which the defendant has been charged. *Beck*, 342 S.C. at 135, 536 S.E.2d at 682–83; *State v. King*, 334 S.C. 504, 514 S.E.2d 578 (1999) (declaring that record must support logical relevance between prior bad act and crime for which defendant is accused). The trial judge must exclude the evidence if its probative value is substantially outweighed by the danger of unfair prejudice to the defendant. *State v. Braxton*, 343 S.C. 629, 541 S.E.2d 833 (2001); *Beck*, 342 S.C. at 135–36, 536 S.E.2d at 683; Rule 403, SCRE.

We rule Tamika Lambert's testimony was admissible as tending to establish Pagan's identity. After Pagan fled the scene for failing to stop for the blue light, he told Lambert that he was accused of killing a woman, and that "Monica" was

to blame for his trouble. Lambert's eyewitness testimony was relevant in putting Pagan's flight into context. The testimony proved Pagan was attempting to flee from police because he was charged with murdering the victim in the present case, and that he blamed the State's key witness, Monique Ellerbee Cooks, for his situation. This testimony was logically relevant as evidence of Pagan's identity because it connected the murder with Pagan's flight from the police one year later.

We conclude Tamika Lambert's testimony was properly admitted as evidence of Pagan's identity under Rule 404(b), SCRE.

### IV. Harmless Error

Assuming *arguendo* the trial judge erred in admitting Tamika Lambert's testimony, we find such error was harmless.

Whether an error is harmless depends on the circumstances of the particular case. *In re Harvey,* 355 S.C. 53, 584 S.E.2d 893 (2003); *State v. Taylor,* 333 S.C. 159, 508 S.E.2d 870 (1998); *State v. Thompson,* 352 S.C. 552, 575 S.E.2d 77 (Ct.App.2003). "No definite rule of law governs this finding; rather, the materiality and prejudicial character of the error must be determined from its relationship to the entire case." *State v. Mitchell,* 286 S.C. 572, 573, 336 S.E.2d 150, 151 (1985).

Error is harmless where it could not reasonably have affected the result of the trial. *In re Harvey,* 355 S.C. at 63, 584 S.E.2d at 897; *Mitchell,* 286 S.C. at 573, 336 S.E.2d at 151; *State v. Burton,* 326 S.C. 605, 486 S.E.2d 762 (Ct.App. 1997). Generally, appellate courts will not set aside convictions due to insubstantial errors not affecting the result. *State v. Sherard,* 303 S.C. 172, 399 S.E.2d 595 (1991); *State v. Adams,* 354 S.C. 361, 580 S.E.2d 785 (Ct.App.2003). Thus, an insubstantial error not affecting the result of the trial is harmless where guilt has been conclusively proven by competent evidence such that no other rational conclusion can be reached. *State v. Bailey,* 298 S.C. 1, 377 S.E.2d 581 (1989); *Adams,* 354 S.C. at 381, 580 S.E.2d at 795; *see also State v. Kelley,* 319 S.C. 173, 460 S.E.2d 368 (1995) (noting that when guilt is conclusively proven by competent evidence, such that no other rational conclusion could be reached, this Court will not set aside conviction for insubstantial errors not affecting

result). The admission of improper evidence is harmless where the evidence is merely cumulative to other evidence. *State v. Haselden,* 353 S.C. 190, 577 S.E.2d 445 (2003); *State v. Braxton,* 343 S.C. 629, 541 S.E.2d 833 (2001); *State v. Blackburn,* 271 S.C. 324, 247 S.E.2d 334 (1978); *State v. Weaverling,* 337 S.C. 460, 523 S.E.2d 787 (Ct.App.1999); *see also State v. Williams,* 321 S.C. 455, 469 S.E.2d 49 (1996) (instructing that error in admission of evidence is harmless where it is cumulative to other evidence which was properly admitted); *State v. Schumpert,* 312 S.C. 502, 435 S.E.2d 859 (1993) (explicating that any error in admission of evidence cumulative to other unobjected-to evidence is harmless).

■ At trial, the State presented evidence of two incidents in Pagan's past that demonstrated his attempts to avoid arrest or prosecution. First, while under investigation for the murder in the case *sub judice,* Pagan fled to his mother's home in New Jersey and refused to return to South Carolina. On January 21, 1998, six days after an arrest warrant was issued, Pagan phoned Lt. Carlos Raines and told Raines that he would turn himself in. When this did not occur, United States Marshals located Pagan in New Jersey approximately one month later, arrested him, and arranged for transport to South Carolina.

Second, in 1995, Pagan was charged with failure to stop for a blue light—the same type of offense that formed the basis of Tamika Lambert's testimony. Pagan stated: "In 1995, I caught a parole violation due to a failure to stop for a blue light. . . . I came [to South Carolina] in '95 to see my kids; that's when I caught the failure to stop for a blue light. And I went back home [to New Jersey] and that's when they violated my parole." In addition to this prior flight and parole violation evidence, the State introduced Pagan's criminal record, which included two convictions for conspiracy to distribute crack cocaine. Extensive testimony was presented regarding Pagan's various stays in prison. Pagan admitted violating certain rules and regulations of the Department of Corrections by getting married while incarcerated at Palmer Pre–Release Center and possessing a cell phone.

Moreover, the State presented a witness, Lavenia Helton, who testified regarding an argument between the victim and Pagan that occurred prior to the murder of the victim. In

early December of 1997, the victim and Pagan were at Helton's apartment. The victim attempted to leave the apartment with a bag of crack cocaine. Pagan told the victim, "Bitch, give me my shit." The victim handed the bag containing the crack cocaine to Pagan, who had a gun in his hand. Pagan then told the victim, "Bitch you gone die."

Because there was testimony regarding other episodes of flight, prior convictions, a parole violation, violations of Department of Corrections rules and regulations, and a previous incident of violence between Pagan and the victim, Lambert's testimony did not have a substantial effect upon Pagan's trial. We hold Tamika Lambert's testimony was cumulative to the evidence presented by the State at trial. Any error in admitting this testimony was harmless.

## CONCLUSION

The trial judge did not err in admitting Tamika Lambert's testimony that Pagan ran from police while out on bond for the murder charge. Lambert's testimony was admissible as (1) flight and "guilty knowledge" evidence; (2) corroboration of Monique's testimony; and (3) evidence of Pagan's identity under Rule 404(b), SCRE. Furthermore, any error in admitting Lambert's testimony was harmless as it was cumulative to the evidence presented at trial. Accordingly, Pagan's conviction is

**AFFIRMED.**

GOOLSBY, J., and CURETON, A.J., concur.