602 S.E.2d 62

**The STATE, Respondent,**

**v.**

**Steve GILLIAN, Appellant.**

**No. 3836.**

Court of Appeals of South Carolina.

Heard June 10, 2004.
Decided June 28, 2004.
Rehearing Denied Sept. 23, 2004.

438

Assistant Appellate Defender Robert M. Dudek, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka and Assistant Attorney General Melody J. Brown, all of Columbia; and Solicitor Warren B. Giese, of Columbia, for Respondent.

ANDERSON, J.:

Steve Gillian appeals a murder conviction arguing reversible error by the trial court in the admission of evidence concerning two prior burglaries and the denial of his right to fully cross-examine two State's witnesses. We affirm.

### FACTUAL/PROCEDURAL BACKGROUND

Steve Gillian planned a lake house burglary which took place on Friday, January 26, 2001. After making maps for use in the burglary and copying a key he obtained to the home, Gillian recruited five younger boys, ages seventeen to

eighteen, to actually enter the house for him. Jeremiah Page and Dustin Johnson were two of the young men recruited by Gillian. While the five boys unlawfully entered the home, Gillian waited at a nearby gas station. A five-shot "Taurus" .38 caliber revolver was one of the items taken from the home.

The boys met Gillian at a local restaurant following the burglary. Gillian was furious at the group's failure to steal any items of value and threatened to kill them. However, Gillian was enthusiastic about the theft of the gun, which he placed in his car's trunk, stating he intended to use it to "do some dirt." Gillian and one other boy then returned to the home to steal additional items, some of which were taken to a wooded area near Gillian's parents' home.

Later that evening, Gillian unsuccessfully attempted to reach Johnson by telephone with the hopes of persuading him to purchase some bullets for the handgun. Johnson "had a fake I.D. that said he was 21." The following day, Gillian, an aspiring hip-hop performer, contacted an older associate in the music industry for the same purpose, but the man refused to buy bullets for Gillian. Thereafter, Johnson reluctantly agreed to purchase the bullets from a local Wal–Mart. Gillian, who gave Johnson the money to pay for the bullets, accompanied Johnson to the Wal-mart store. Both Johnson and Gillian were identified on store security video purchasing the bullets on Saturday, January 27. Gillian still possessed the handgun that afternoon.

On Saturday evening, Gillian attended various parties in the Irmo and Chapin area. Most of these parties were hosted by high school students whose parents were out of town. Around midnight, Gillian, Page (an accomplice in the prior burglary), and several friends, most of whom had been drinking, met at high school senior Michael Glenn's home. Shortly after arriving at Glenn's home, Gillian left this gathering to pick up his friend Jason Ward. Gillian, accompanied by Ward, returned to the party. In the early hours of Sunday morning, Gillian and Ward left the party without Page and drove to the apartment of one of Ward's co-workers.

After Gillian and Ward left the party, Page began acting violently. He was forcefully removed from the Glenn residence by two party attendees. Once he calmed down outside,

Page asked the occupants if he could reenter the residence and use the phone to secure a ride home. Once inside the home, Page telephoned Gillian and informed him of the previous altercation. About 5:00 a.m., Gillian received a cell phone call. In response to the call, Gillian declared to Ward: "Jason, we got to go. Somebody just got shot. We got to go." Gillian and Ward returned to the party approximately ten minutes after Gillian spoke with Page.

Upon arriving at the Glenn residence, Gillian physically attacked at least four of the younger party attendees and demanded to see the two people who had thrown Page out of Glenn's house. Gillian slapped several partygoers and headbutted one in the face, breaking his nose. Gillian asked the partygoers "why they jumped [Page] and just threatened to beat them up for jumping his friend." After questioning the boys who had earlier escorted Page from the party and learning they had not seriously injured him, Gillian turned his rage upon the much smaller Page for misleading him, severely beating Page, who was "[c]rying and trying to cover his face."

At this point, Ward, who had been sitting quietly at the kitchen table, confronted Gillian about his behavior. Ward stated: "Why are you messing with these kids, man? They are scared of you. They don't want to fight you.... [Q]uit picking on these little high school kids." Gillian "told [Ward] that he was nothing and to shut up." Gillian then directed his intensified hostility toward his friend Ward, who calmly refused to fight Gillian despite minutes of attempted instigation and taunting. Ward eventually responded to Gillian's threats by quickly punching him "once or twice" and pinning him to the floor in front of several party attendees. After Gillian "agreed ... to calm down," Ward allowed him to stand up, but the threats continued. Around 5:30 a.m., Ward agreed to leave the party with Gillian. Ward said to Gillian, "Just take me home." As he left the Glenn residence, Gillian loudly declared to several party guests, "You will see this in the newspapers tomorrow."

Around 6:30 a.m., residents of an area in close proximity to the Boozer Shopping Center heard approximately four to five gunshots. Ward's body was found behind the shopping center at about 8:30 a.m. on January 28. Ward had four bullet

wounds to the head and one to the neck. It was later established the wounds were caused by ".38–caliber copper-jacketed bullets" identical to those purchased earlier by Gillian. Markings on the four recovered bullets were consistent with bullets fired from a .38 caliber handgun manufactured by the "Taurus" company, as well as seven other manufacturers. The murder weapon was never recovered.

Gillian arrived at his parents' home around 8:30 a.m. on Sunday morning and entered his brother's bedroom. While speaking to his brother, he confessed he had "shot [Ward] several times." Prior to Ward's murder, Gillian had made comments to his cousin to the effect his music career would benefit from the reputation gained by killing another. According to Gillian's cousin, Gillian earlier professed that "if he had killed someone, it would make him real" and he "thought if he killed someone, he could appeal to the rap-type music crowd." Around 9:00 a.m., Gillian walked over to his cousin's house next door and entered his bedroom. In a drunken stupor, Gillian told his cousin he had killed someone, explaining that he lured the victim behind the jewelry store he had once robbed under the guise of showing the victim how he broke into the store. Select members of Gillian's family and friends knew of Gillian's robbery, months before, of several women's "Tag Heuer" watches from a jewelry store. Dems Jewelry Store, in Boozer Shopping Center, had reported a break-in and a resulting loss of thirty-four women's "Tag Heuer" watches in July of 2000.

Steve Gillian was later arrested and indicted for the murder of Jason Ward. The jury found Gillian guilty of murder. The judge sentenced Gillian to life imprisonment without parole.

### ISSUES

I. Did the trial court err in allowing evidence of Gillian's two prior burglaries?

II. Did the trial court err in denying Gillian the right to fully cross-examine witness Jeremiah Page as to the possible sentence he was facing for first-degree burglary?

III. Did the trial court err by refusing to admit evidence of the attempted police ruse concerning "doctored" photographs of Gillian's car near the murder scene?

*LAW/ANALYSIS*

## I. EVIDENCE OF PRIOR BURGLARIES

Gillian argues the trial court erred in admitting evidence of his two prior burglaries. Specifically, he maintains "[e]vidence of the other burglaries was not necessary to establish that [Gillian] had possession of a gun at the time of the murder." He contends the evidence was admitted in violation of Rules 403 and 404(b), SCRE, and *State v. Lyle,* 125 S.C. 406, 118 S.E. 803 (1923). We disagree.

 Generally, South Carolina law precludes evidence of a defendant's prior crimes or other bad acts to prove the defendant's guilt for the crime charged. *State v. Pagan,* 357 S.C. 132, 591 S.E.2d 646 (Ct.App.2004); *State v. Weaverling,* 337 S.C. 460, 523 S.E.2d 787 (Ct.App.1999). It is well established that evidence of other crimes or prior bad acts is inadmissible to show criminal propensity or to demonstrate the accused is a bad individual. *State v. Johnson,* 293 S.C. 321, 360 S.E.2d 317 (1987); *see also State v. Beck,* 342 S.C. 129, 536 S.E.2d 679 (2000) (finding that evidence of prior crimes or bad acts is inadmissible to prove bad character of defendant or that he acted in conformity therewith).

 However, evidence of other crimes is generally admissible when it is necessary to establish a material fact or element of the crime charged. *See Johnson,* 293 S.C. at 324, 360 S.E.2d at 319; *State v. Byers,* 277 S.C. 176, 284 S.E.2d 360 (1981); *State v. Cheatham,* 349 S.C. 101, 561 S.E.2d 618 (Ct.App.2002). Thus, such evidence is admissible when it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the proof of the other; or (5) the identity of the person charged with the present crime. *See* Rule 404(b), SCRE; *State v. Lyle,* 125 S.C. 406, 118 S.E. 803 (1923); *see also Anderson v. State,* 354 S.C. 431, 581 S.E.2d 834 (2003) (explaining that Rule 404, the modern expression of the *Lyle* rule, excludes evidence of other crimes, wrongs, or acts offered to prove character of person in order to show action in conformity therewith; the rule creates an exception when testimony is offered to show motive, identity,

existence of common scheme or plan, absence of mistake or accident, or intent).

■ If not the subject of a conviction, a prior bad act must first be established by clear and convincing evidence. *Beck,* 342 S.C. at 135, 536 S.E.2d at 683. The bad act must logically relate to the crime with which the defendant has been charged. *Beck,* 342 S.C. at 135, 536 S.E.2d at 682–83; *see also State v. King,* 334 S.C. 504, 514 S.E.2d 578 (1999) (declaring that record must support logical relevance between prior bad act and crime for which defendant is accused). In making the determination of whether evidence of prior bad acts is admissible, the trial court must gauge its logical relevancy to the particular purpose for which it is sought to be introduced. *See State v. Nix,* 288 S.C. 492, 343 S.E.2d 627 (Ct.App.1986). If the prior bad act evidence is "logically pertinent in that it reasonably tends to prove a material fact in issue, it is not to be rejected merely because it incidentally proves the defendant guilty of another crime." *Id.* at 497, 343 S.E.2d at 630–31 (internal quotations omitted). If there is any evidence to support the admission of bad act evidence, the trial judge's ruling will not be disturbed on appeal. *Pagan,* 357 S.C. at 143, 591 S.E.2d at 652 (citing *State v. Wilson,* 345 S.C. 1, 545 S.E.2d 827 (2001)).

■ Even if evidence of other crimes is admissible under Rule 404(b), the trial judge must exclude the evidence if its probative value is substantially outweighed by the danger of unfair prejudice to the defendant. *State v. Braxton,* 343 S.C. 629, 541 S.E.2d 833 (2001); *Beck,* 342 S.C. at 135–36, 536 S.E.2d at 683; *see also* Rule 403, SCRE ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.").

In the case at bar, the State introduced evidence of two prior burglaries committed by Gillian.

### A. The Lake House Burglary

■■ Evidence sufficiently relevant to the possession of particular property later used in furtherance of criminal activi-

ty is generally admissible to prove the identity of the accused in the subsequent trial for those crimes, even when such evidence incidentally reflects the defendant's guilt of a previous crime. *See State v. Southerland,* 316 S.C. 377, 447 S.E.2d 862 (1994), *overruled in part on other grounds by State v. Chapman,* 317 S.C. 302, 454 S.E.2d 317 (1995); *State v. Nix,* 288 S.C. 492, 343 S.E.2d 627 (Ct.App.1986).

In *State v. Southerland,* our Supreme Court explicated:

Southerland contends that the trial judge erred by allowing the State to introduce evidence that he stole the shotgun used to kill Quinn from a trailer two weeks before the murder and that he traded the shotgun for drugs the day after the murder. We disagree.

. . . .

. . . [T]he introduction of the evidence at trial was proper. While evidence of other crimes is inadmissible to prove the bad character of a defendant, it may be admissible when it tends to establish (1) motive, (2) intent, (3) absence of mistake or accident, (4) a common scheme or plan, or (5) identity. *State v. Johnson,* 306 S.C. 119, 125, 410 S.E.2d 547, 551 (1991), *cert. denied,* 503 U.S. 993, 112 S.Ct. 1691, 118 L.Ed.2d 404 (1992) (citing *State v. Lyle,* 125 S.C. 406, 118 S.E. 803 (1923)). The evidence showed that Southerland possessed a shotgun at the time of the murder, that the shotgun was the type used to kill Quinn, and that Southerland disposed of the shotgun after the murder. This evidence established **identity** and a common scheme. Therefore, we find that the trial court properly admitted the evidence.

*Southerland,* 316 S.C. at 382–83, 447 S.E.2d at 866 (emphasis added).

Here, evidence relating to Gillian's role in the burglary of the lake house was properly admitted to show that the stolen gun, which was in Gillian's possession, was consistent with the type of weapon that fired the bullets recovered from Ward's body. A .38 caliber "Taurus" revolver was one of the items stolen from the home. Gillian obtained this revolver from his burglary accomplices and placed it in the trunk of his car. The fact that this particular firearm was deemed compatible with the bullet wounds inflicted on Ward was central to the

State's case against Gillian. Although the State presented evidence Gillian possessed a gun and purchased .38 caliber ammunition, evidence of the break-in and theft of that particular firearm was necessary to establish the probative connection between the stolen handgun and the following facts: (1) the victim was shot five times by a five-shot revolver; and (2) the recovered bullets were consistent with those fired by a "Taurus" revolver. The evidence of the prior burglary buttressed the testimony of the former gun owner and the State's forensic expert.

The lake house burglary was necessarily admitted to prove a material fact of the State's case for murder, that being Gillian's possession of the particular firearm allegedly used in the murder of Ward. Evidence of this burglary was admissible as tending to establish Gillian's identity as perpetrator of Ward's murder. Gillian's commission of the lake house burglary was demonstrated by clear and convincing proof. Gillian's lake house burglary was properly admitted as it had a clear "logical relevance" to Gillian's possession of a firearm linked, if only circumstantially, to the murder. Therefore, the evidence was probative as to the fundamental element of identity pursuant to Rule 404(b), SCRE. *See State v. Adams*, 322 S.C. 114, 470 S.E.2d 366 (1996) (holding evidence properly admitted when logical relevance existed between the evidence and an element of the crime charged).

## B. The Dems Jewelry Store Burglary

Upon visiting his cousin the morning following the alleged murder, Gillian admitted to luring Ward to the area of his prior jewelry store break-in. Gillian's cousin testified:

He took him behind Dems, "The jewelry store that I had robbed," is what he said. He said, "I was going to kind of show him how I robbed the place. Instead I just shot him a couple of times and left him there because I figured no one would find out because they did not find out that I robbed the place."

Gillian's cousin understood these statements to refer to Gillian's prior theft of women's watches from Dems Jewelry Store. About six months prior to the murder, Dems reported a break-in and theft of thirty-four women's watches. Ward's

body was discovered behind Boozer Shopping Center, the location of Dems Jewelry Store.

The evidence establishes a clear chain of inferences indubitably relevant to the identity of Gillian as Ward's killer. Because the probative value of Gillian's confession to his cousin is severely diminished without evidence of the prior jewelry store burglary, the evidence was necessary to establish a key element of the crime charged, that being the identity of Gillian as the guilty party. *See State v. Johnson,* 293 S.C. 321, 324, 360 S.E.2d 317, 319 (1987) ("Evidence of other crimes is ... admissible ... [if] necessary to establish a material fact or element of the crime charged."). The State presented clear and convincing evidence that Gillian committed the Dems Jewelry Store burglary.

The trial court properly admitted evidence of the Dems Jewelry Store burglary. Evidence of Gillian's burglary of Dems Jewelry Store was admissible as tending to establish Gillian's identity as Ward's murderer pursuant to Rule 404(b), SCRE.

## C. *Res Gestae*

The admission of the evidence in regard to the lake house and Dems Jewelry Store burglaries is proper under *State v. Adams,* 354 S.C. 361, 580 S.E.2d 785 (Ct.App.2003):

Adams contends the trial court erred in allowing the admission of evidence regarding the theft of the cabinets because it amounted to the prejudicial admission of a prior bad act.

Our Supreme Court discussed the *res gestae* theory in *State v. Adams,* 322 S.C. 114, 470 S.E.2d 366 (1996):

One of the accepted bases for the admissibility of evidence of other crimes arises when such evidence "furnishes part of the context of the crime" or is necessary to a "full presentation" of the case, or is so intimately connected with and explanatory of the crime charged against the defendant and is so much a part of the setting of the case and its "environment" that its proof is appropriate in order "to complete the story of the crime on trial by proving its immediate context or the 'res gestae'" or the "uncharged offense is 'so linked together in point of

time and circumstances with the crime charged that one cannot be fully shown without proving the other . . .' [and is thus] part of the res gestae of the crime charged." And where evidence is admissible to provide this "full presentation" of the offense, "[t]here is no reason to fragmentize the event under inquiry" by suppressing parts of the "res gestae."

*Id.* at 122, 470 S.E.2d at 370–71 (quoting *United States v. Masters,* 622 F.2d 83, 86 (4th Cir.1980)). Under the *res gestae* theory, evidence of other bad acts may be an integral part of the crime with which the defendant is charged or may be needed to aid the fact finder in understanding the context in which the crime occurred. *State v. Owens,* 346 S.C. 637, 552 S.E.2d 745 (2001); *State v. King,* 334 S.C. 504, 514 S.E.2d 578 (1999).

We rule the testimony regarding the cabinets was admissible under the *res gestae* theory. The timing of the burglaries, and what was taken from the model home in each one, were integral parts of the context in which the crime was committed. Thus, admission of the testimony regarding the cabinets was necessary and relevant to a full presentation of the evidence. The trial court did not err in allowing the admission of the evidence under the *res gestae* theory . . . . .

*Adams,* 354 S.C. at 379–80, 580 S.E.2d at 794–95.

In the case *sub judice,* the facts, *modus operandi,* and timing of the burglaries constitute quintessential *res gestae* evidence. Thus, admission of the testimony regarding the two burglaries was necessary and relevant to a full presentation of the evidence in this case.

## II. JEREMIAH PAGE/SENTENCING POSSIBILITIES

### A. Confrontation Clause/Rule 608(c), SCRE

Gillian asserts the trial court erred in denying his request to cross-examine witness Jeremiah Page concerning the possible sentence Page was facing for first-degree burglary.

Page testified extensively at trial as to the burglary of the lake house, Gillian's possession of the stolen revolver, Gillian's statement that he was going to "do some dirt" with the

weapon, and the events at the Glenn residence. On direct examination, Page admitted he was currently charged with first-degree burglary and the Richland County solicitor had agreed to advise his plea judge of his cooperation in Gillian's trial. On cross-examination, Gillian's defense counsel asked if the first-degree burglary charge "carries a sentence of 15 to life." The Solicitor immediately objected. The objection was sustained and later questioning limited references to Page's possible sentence to "a lot of time" and "[s]erious time." Subsequently, Gillian argued he should have been allowed to cross-examine Page as to the possible sentence he was facing in order to show bias in his testimony. Gillian declared: "I would ask that the jury be informed that the sentence for burglary first is a mandatory 15 to life, and it's a no-parole offense." The judge held:

[T]he problem with getting into specific sentences is it can actually be misleading to the jury.

They may have the impression that he is facing 15 years to life. As you know, he is also facing the possibility of probation. It just depends on the circumstances.

So that is why I have always stayed away from sentences, specific sentences, on anything. I think it always appropriate to say, "You are facing a lot of time," or a long sentence or something like that.

The Confrontation Clause guarantees an accused the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. The right of confrontation is essential to a fair trial in that it promotes reliability in criminal trials and insures that convictions will not result from testimony of individuals who cannot be challenged at trial. *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970); *State v. Martin*, 292 S.C. 437, 357 S.E.2d 21 (1987). The Confrontation Clause requires a witness to testify under oath and submit to cross-examination so that the jury can observe the witness's demeanor and assess his credibility. *State v. Cooper*, 291 S.C. 351, 353 S.E.2d 451 (1987).

The Sixth Amendment rights to notice, confrontation, and compulsory process guarantee that a criminal charge may be answered through the calling and interrogation of favorable witnesses, the cross-examination of adverse wit-

nesses, and the orderly introduction of evidence. *See State v. Mizzell,* 349 S.C. 326, 563 S.E.2d 315 (2002); *State v. Graham,* 314 S.C. 383, 444 S.E.2d 525 (1994); *State v. Schmidt,* 288 S.C. 301, 342 S.E.2d 401 (1986); *see also Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965) (holding the Sixth Amendment applicable to the states through the Fourteenth Amendment). Specifically included in a defendant's Sixth Amendment right to confront the witness is the right to meaningful cross-examination of adverse witnesses. *State v. Cheeseboro,* 346 S.C. 526, 552 S.E.2d 300 (2001); *Graham,* 314 S.C. at 385, 444 S.E.2d at 527. The Sixth Amendment essentially "constitutionalizes" the right to present a defense in an adversary criminal trial. *Schmidt,* 288 S.C. at 303, 342 S.E.2d at 402.

▉▉▉▉▉ The primary interest secured by the Confrontation Clause of the Sixth Amendment is the right to cross-examination. *State v. Shuler,* 344 S.C. 604, 545 S.E.2d 805 (2001); *Starnes v. State,* 307 S.C. 247, 414 S.E.2d 582 (1991); *see also Graham,* 314 S.C. at 385, 444 S.E.2d at 527 (specifically included in defendant's Sixth Amendment right to confront witness is right to meaningful cross-examination of adverse witnesses). The Confrontation Clause guarantees a defendant the opportunity to cross-examine a witness concerning bias. *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *State v. Brown,* 303 S.C. 169, 399 S.E.2d 593 (1991); *see also Mizzell,* 349 S.C. at 331, 563 S.E.2d at 317 (defendant has right to cross-examine witness concerning bias under Confrontation Clause). Considerable latitude is allowed in the cross-examination of a witness for potential bias. *State v. Clark,* 315 S.C. 478, 445 S.E.2d 633 (1994); *Brown,* 303 S.C. at 171, 399 S.E.2d at 594; *State v. McFarlane,* 279 S.C. 327, 306 S.E.2d 611 (1983). On cross-examination, any fact may be elicited which tends to show interest, bias, or partiality of the witness. *Mizzell,* 349 S.C. at 331, 563 S.E.2d at 317; *State v. Starnes,* 340 S.C. 312, 531 S.E.2d 907 (2000); *State v. Brewington,* 267 S.C. 97, 226 S.E.2d 249 (1976). The appropriate question under a Confrontation Clause analysis is whether there has been any interference with the defendant's opportunity for effective cross-examination at trial. *Kentucky v. Stincer,* 482 U.S. 730, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987);

*Shuler,* 344 S.C. at 624, 545 S.E.2d at 815; *Starnes,* 307 S.C. at 250, 414 S.E.2d at 583.

A criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby to expose to the jury the facts from which jurors could appropriately draw inferences relating to the reliability of the witness. *Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). The Confrontation Clause does not, however, prevent a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. *Id.* On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, witness' safety, or interrogation that is repetitive or only marginally relevant. *Id.* Before a trial judge may limit a criminal defendant's right to engage in cross-examination to show bias on the part of the witness, the record must clearly show the cross-examination is inappropriate. *Mizzell,* 349 S.C. at 331, 563 S.E.2d at 317.

In *State v. Sims,* 348 S.C. 16, 558 S.E.2d 518 (2002), the defendant appealed his murder conviction, claiming the trial court erred by limiting his cross-examination of a State witness regarding the witness's pending charges. The South Carolina Supreme Court explained:

Prior to the State's witness, Michael Peterson, taking the stand, defense counsel argued appellant should be allowed to ask Peterson about his pending charges. Defense counsel desired to question Peterson about what the *pending* charges were to show bias under Rule 608(c), SCRE, because Peterson had possibly been promised a deal in exchange for his testimony. The State responded there was no promised deal, but that Peterson had been told when he went to trial on the charges, the State would tell the trial judge he had cooperated by testifying in the instant case. The trial court ruled defense counsel could generally ask whether Peterson had pending charges and whether there was anything promised him with regard to those pending

charges. However, defense counsel was not allowed to question Peterson as to the crimes with which he was charged.

Peterson's pending charges were: (1) possession of crack cocaine with intent to distribute (PWID); (2) PWID within proximity of a school; (3) robbery, two counts; (4) first degree burglary; (5) grand larceny; (6) malicious injury to real property, two counts; and (7) possession of a controlled substance. If convicted of the first degree burglary charge, Peterson was facing a possible sentence of life imprisonment. S.C.Code Ann. § 16–11–311(B) (Supp.2000).

. . . .

On cross, defense counsel questioned Peterson as to what he expected to receive regarding his pending charges in exchange for his testimony. Defense counsel also questioned Peterson about his prior convictions.

. . . .

Appellant sought to expose Peterson's possible bias and prejudice by asking Peterson what the crimes were with which he was charged. Because of the number of charges pending against Peterson and the severity of the potential sentences, we find the evidence was probative on the issue of bias and should have been admitted. There was the substantial possibility Peterson would give biased testimony in an effort to have the solicitor highlight to his future trial judge how he had cooperated in the instant case. The excluded evidence had "a legitimate tendency to throw light on the accuracy, truthfulness, and sincerity" of Peterson's testimony. Therefore, under these circumstances, we find the trial court committed error under Rule 608(c) by improperly limiting the scope of appellant's cross-examination.

*Sims,* 348 S.C. at 23–26, 558 S.E.2d at 522–23 (citation omitted).

The Court, in *State v. Mizzell,* 349 S.C. 326, 563 S.E.2d 315 (2002), addressed a similar issue. In *Mizzell,* the defendants were charged with first-degree burglary, grand larceny and possession of a firearm during the commission of a violent crime. *Id.* at 329, 563 S.E.2d at 316. During the trial, the State's key witness, Donald Steele, testified he and his wife accompanied defendants to the burglarized home. *Id.* at 330,

563 S.E.2d at 317. On cross-examination, Steele admitted the State charged him with the same crimes as defendants. *Id.* The trial court excluded evidence of the possible sentence Steele faced but permitted defendants to examine Steele about the sentence in general terms. *Id.* A jury convicted defendants of second degree burglary and grand larceny. *Id.* at 329, 563 S.E.2d at 316.

On appeal, defendants argued the trial court erred in violating their rights under the Sixth Amendment's Confrontation Clause by limiting the cross-examination of Steele. Specifically, defendants asserted the trial court should have permitted defense counsel to elicit from Steele the possible punishment he could receive if he were convicted of the charged crimes. Our Supreme Court inculcated:

> The trial judge prohibited questioning Steele about a specific possible sentence because the charges against Steele and [defendants] were the same. "The purpose of preventing disclosure of the potential sentence facing the defendant is that such evidence is irrelevant to the jury and could possibly prejudice the State's right to a fair trial." *Illinois v. Brewer,* 245 Ill.App.3d 890, 185 Ill.Dec. 917, 615 N.E.2d 787, 790 (1993) . . . . .

> The jury is, generally, not entitled to learn the possible sentence of a defendant because the sentence is irrelevant to finding guilt or innocence. However, other constitutional concerns, such as the Confrontation Clause, limit the applicability of this rule in circumstances where the defendant's right to effectively cross-examine a co-conspirator witness of possible bias outweighs the need to exclude the evidence.

> . . . .

> The case *sub judice* is distinctive because the co-conspirator witness was charged with the same crimes as [defendants] but had neither agreed to a plea bargain nor pled guilty. [Defendants] assert the State should not be allowed to rely on this distinction to exclude this testimony because the absence of the agreement, if anything, suggests the witness will testify more favorably to the State's position. [Defendants] argue Steele would reasonably have felt the quality of his cooperation would determine the degree of benefit he would later receive. *See Boone v. Paderick,* 541

F.2d 447, 451 (4th Cir.1976) ("[A] promise to recommend leniency (without assurance of it) may be interpreted by the promisee as contingent upon the quality of the evidence produced; the more uncertain the agreement, the greater the incentive to make the testimony pleasing to the promisor."). We agree.

. . . .

The fact the witness has yet to reach a plea bargain or been found guilty should not prevent the admission of such evidence. The lack of a negotiated plea, if anything, creates a situation where the witness is more likely to engage in biased testimony in order to obtain a future recommendation for leniency. Accordingly, we conclude the Court of Appeals erred in holding the trial judge properly excluded testimony concerning Steele's potential sentence if convicted of the same crimes as [defendants].

*Mizzell,* 349 S.C. at 331–33, 563 S.E.2d at 317–18.

 Included in the Confrontation Clause protection is the right to cross-examine any State's witness as to possible sentences faced when there exists "a substantial possibility [the witness] would give biased testimony in an effort to have the solicitor highlight to [a] future [court]" how the witness cooperated in the instant case. *See Sims,* 348 S.C. at 25, 558 S.E.2d at 523; *see also Mizzell,* 349 S.C. at 332–33, 563 S.E.2d at 318. Accordingly, the trial court erred in excluding evidence concerning Page's possible sentence.

## B. Harmless Error

 Our inquiry, however, does not end upon finding the trial court committed an error in limiting the cross-examination of Page. "A violation of the defendant's Sixth Amendment right to confront the witness is not *per se* reversible error" if the "error was harmless beyond a reasonable doubt." *State v. Mizzell,* 349 S.C. 326, 333, 563 S.E.2d 315, 318 (2002) (quoting *State v. Graham,* 314 S.C. 383, 385, 444 S.E.2d 525, 527 (1994)) (internal quotations omitted). This Court must determine whether the error was harmless beyond a reasonable doubt. *Graham,* 314 S.C. at 385, 444 S.E.2d at 527. No definite rule of law governs the finding that an error was harmless; rather, the materiality and prejudicial charac-

ter of the error must be determined from its relationship to the entire case. *State v. Reeves*, 301 S.C. 191, 391 S.E.2d 241 (1990); *State v. Mitchell*, 286 S.C. 572, 336 S.E.2d 150 (1985); *State v. Pagan*, 357 S.C. 132, 591 S.E.2d 646 (Ct.App.2004). Whether an error is harmless depends on the particular facts of each case and upon a host of factors, including:

> the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and of course the overall strength of the prosecution's case.

*Mizzell*, 349 S.C. at 333, 563 S.E.2d at 318–19 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)).

"Harmless beyond a reasonable doubt" means the reviewing court can conclude the error did not contribute to the verdict beyond a reasonable doubt. *Mizzell*, 349 S.C. at 334, 563 S.E.2d at 319; *Arnold v. State*, 309 S.C. 157, 420 S.E.2d 834 (1992). "In determining whether an error is harmless, the reviewing court must review the entire record to determine what effect the error had on the verdict." *Mizzell*, 349 S.C. at 334, 563 S.E.2d at 319 (internal quotations omitted).

 Error is harmless where it could not reasonably have affected the result of the trial. *In re Harvey*, 355 S.C. 53, 584 S.E.2d 893 (2003); *Mitchell*, 286 S.C. at 573, 336 S.E.2d at 151; *State v. Burton*, 326 S.C. 605, 486 S.E.2d 762 (Ct.App.1997). Generally, appellate courts will not set aside convictions due to insubstantial errors not affecting the result. *State v. Sherard*, 303 S.C. 172, 399 S.E.2d 595 (1991); *State v. Adams*, 354 S.C. 361, 580 S.E.2d 785 (Ct.App.2003). Thus, an insubstantial error not affecting the result of the trial is harmless where guilt has been conclusively proven by competent evidence such that no other rational conclusion can be reached. *State v. Bailey*, 298 S.C. 1, 377 S.E.2d 581 (1989); *Adams*, 354 S.C. at 381, 580 S.E.2d at 795; *see also State v. Kelley*, 319 S.C. 173, 460 S.E.2d 368 (1995) (noting that when guilt is conclusively proven by competent evidence, such that no other rational conclusion could be reached, this Court will not set aside conviction for insubstantial errors not affecting result).

Although the *Sims* Court found the judge erred by improperly limiting the scope of appellant's cross-examination, the Supreme Court determined:

> However, the trial court's error of limiting the scope of appellant's cross-examination is harmless. *See State v. Mitchell*, 286 S.C. 572, 336 S.E.2d '150 (1985) (trial errors are harmless where they could not reasonably have affected result of trial). The State's case against appellant was strong without resorting to Peterson's testimony . . . . .
>
> Accordingly, while the trial court erred by limiting appellant's cross-examination of Peterson, the error was harmless because the error could not reasonably have affected the result of trial. *See State v. Mitchell, supra.*

*State v. Sims*, 348 S.C. 16, 26, 558 S.E.2d 518, 523–24 (2002). In contrariety to *Sims*, the *Mizzell* Court concluded the trial court committed reversible error:

> Considering the *Van Arsdall* factors, we note much of Steele's testimony was either cumulative or corroborated by other witnesses. . . .
>
> Critically, however, Steele was the only witness to testify as an eyewitness to [defendants'] burglary of the home. The lack of physical evidence placing [defendants] at the scene enhanced the importance of Steele's testimony. As in [*State v.*] *Brown*, [303 S.C. 169, 399 S.E.2d 593 (1991),] the co-conspirator witness is the only link placing [defendants] at the scene of the crime.
>
> . . . .
>
> Because Steele was the only witness to directly link [defendants] to the burglary, we cannot say the trial court's error was harmless beyond a reasonable doubt. Accordingly, we find the trial court committed prejudicial error in limiting [defendants'] cross-examination into Steele's possible sentence.

*State v. Mizzell*, 349 S.C. 326, 334–35, 563 S.E.2d 315, 319–20 (2002). The case at bar is analogous to *Sims*.

First, in the case against Gillian, the testimony of Page was largely cumulative. Other witnesses testified as to both the lake house burglary and the events of the evening and early morning hours leading up to the murder. In fact, Gillian's vague statement that he intended to use the gun to "[d]o some

dirt" was the only evidence on record supported solely by the testimony of Page. Unlike *Mizzell*, the absence of this witness' testimony leaves no material point of the State's case uncorroborated or unsupported by the testimony of other witnesses.

Second, even assuming the omission of Page's testimony, there remains, at the very least, abundant evidence upon which one could find Gillian guilty of murder. Gillian was in possession of a five-shot revolver consistent with the handgun used to shoot Ward five times. He stated to an entire household of partygoers, as he was leaving with Ward (who had just embarrassed him in front of several others), that they would "see this in the newspapers tomorrow." Following the murder, Gillian confessed to his brother that he had killed Ward. In addition, he admitted to his cousin that he had killed someone behind a jewelry store. Concomitantly, while the trial court erred by limiting Gillian's cross-examination of Page, the error was harmless because it could not reasonably have affected the result of the trial. *See Sims*, 348 S.C. at 26, 558 S.E.2d at 523–24; *Mitchell*, 286 S.C. at 573, 336 S.E.2d at 151.

### III. THE POLICE RUSE

█ Gillian avers the trial court erred by refusing to admit evidence of the attempted police ruse concerning "doctored" photographs of Gillian's car near the murder scene. We disagree.

In testimony proffered outside of the jury's presence, Lieutenant James Smith, an investigator with the Richland County Sheriff's Department, admitted police falsified aerial photographs "to make it appear to be a satellite photograph showing the [d]efendant's vehicle at the rear of Boozer Shopping Center at the time frame of the incident." These falsified photographs were used during Gillian's interrogation in an attempt to compel a confession. This ruse, however, failed to elicit the desired confession. Because the photographs did not compel any evidence or statements which were used in the State's case, the trial court ruled all evidence of the ploy inadmissible.

"All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Consti-

tution of the State of South Carolina, statutes, these rules, or by other rules promulgated by the Supreme Court of South Carolina." Rule 402, SCRE; *State v. Aleksey*, 343 S.C. 20, 538 S.E.2d 248 (2000); *State v. Horton*, Op. No. 3787 (S.C. Ct.App. filed April 6, 2004) (Shearouse Adv. Sh. No. 18 at 61). "Relevant evidence" is defined as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, SCRE; *State v. Pagan*, 357 S.C. 132, 591 S.E.2d 646 (Ct.App.2004). Under Rule 401, evidence is relevant if it has a direct bearing upon and tends to establish or make more or less probable the matter in controversy. *In re Corley*, 353 S.C. 202, 577 S.E.2d 451 (2003); *State v. Adams*, 354 S.C. 361, 580 S.E.2d 785 (Ct.App.2003); *see also State v. Alexander*, 303 S.C. 377, 380, 401 S.E.2d 146, 148 (1991) ("Evidence is relevant if it tends to establish or make more or less probable some matter in issue upon which it directly or indirectly bears."). Yet, even relevant evidence may be excluded if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of under delay, waste of time, or needless presentation of cumulative evidence." Rule 403, SCRE.

The trial judge excluded the evidence based on a mixed determination of its irrelevance and its probability of confusing the jury on the issues of the case. Because the ruse did not result in a confession or incriminating statements, it was of questionable relevance to the issue of Gillian's guilt and did not expose, as the record reflects, any weakness in the State's case against Gillian.

 The admission or exclusion of evidence is left to the sound discretion of the trial judge. *State v. Adams*, 354 S.C. 361, 580 S.E.2d 785 (Ct.App.2003). A trial judge's evidentiary rulings will not be reversed on appeal absent an abuse of discretion or the commission of legal error which results in prejudice to the defendant. *State v. Hamilton*, 344 S.C. 344, 543 S.E.2d 586 (Ct.App.2001); *State v. Mansfield*, 343 S.C. 66, 538 S.E.2d 257 (Ct.App.2000).

Gillian misconstrues *Frazier v. Cupp*, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969), asserting that case holds that

evidence of police investigation tactics is always relevant in a criminal trial; therefore, the trial court's exclusion was based on legal error. We find this reliance misplaced. *Frazier* concerned a confession elicited by disingenuous investigation tactics. The United States Supreme Court briefly noted that evidence of the police investigation was relevant and admissible to determine the voluntary nature of the confession. *Frazier*, 394 U.S. at 739, 89 S.Ct. 1420. Similarly, *State v. Von Dohlen*, 322 S.C. 234, 471 S.E.2d 689 (1996), reiterated the principle that a determination of whether a confession was given voluntarily requires an examination of all the circumstances surrounding the confession. *Von Dohlen*, 322 S.C. at 243, 471 S.E.2d at 694–95. The subterfuge at issue elicited no confession or incriminating statements. Consequently, no issue arose as to whether a statement was voluntarily given. The exclusion of the evidence, based on Rules 401 and 403, SCRE, did not arise from any error of law.

We find no abuse of discretion or error of law. The trial judge acted within his discretion in excluding the evidence.

## CONCLUSION

For the foregoing reasons, Gillian's conviction and sentence for murder are

**AFFIRMED.**

HUFF and KITTREDGE, JJ., concur.