636 S.E.2d 649

**The STATE, Respondent,**

v.

**Thaddeus CURRY, Appellant.**

**No. 4159.**

Court of Appeals of South Carolina.

Heard June 15, 2006.

Decided Oct. 9, 2006.

Assistant Appellate Defender Robert M. Dudek, Office of Appellate Defense, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Assistant Attorney General Jeffery A. Jacobs, Office of the Attorney General, of Columbia; and Solicitor Barbara R. Morgan, of Aiken, for Respondent.

HEARN, C.J.

Thaddeus Curry appeals his convictions for murder and possession of a firearm during the commission of a violent crime in connection with the death of Heath Hamilton. On appeal, Curry argues (1) the trial court erred in limiting the scope of his cross-examination of two co-defendants on sentencing exposure they faced for murder and other charges related to Hamilton's death, and (2) the trial court erred in charging the jury on "the hand of one is the hand of all" theory. We affirm.

## FACTS

Shortly after midnight on March 18, 2003, Hamilton and Ronald Coursey drove to an apartment complex in Augusta, Georgia, to purchase marijuana. In the apartment complex's parking lot, they encountered Anthony Savage and Curry and asked if they had any marijuana to sell. Curry and Savage said they had no marijuana, but agreed to procure some and sell a quarter pound's worth to Hamilton and Coursey for $220.

Hamilton and Coursey drove to an ATM and withdrew money to pay for the drugs. Meanwhile, Curry, Savage, and Jeremy Simuel drove around Augusta looking for marijuana to sell to Hamilton and Coursey. They were unsuccessful. When they all returned to the apartment complex, Hamilton and Coursey followed Curry, Savage, and Simuel to Simuel's apartment. Hamilton and Coursey waited outside the apartment while the others went inside and closed the door. They were soon informed the transaction would occur later.

Hamilton and Coursey left the apartment complex and went to Hamilton's home in Beech Island in Aiken County, where they smoked marijuana and waited until Curry and Savage called. The parties spoke by phone and agreed to meet at a gas station in Beech Island. Although Curry, Savage, and Simuel failed to procure marijuana to sell Hamilton and Coursey, they apparently intended to meet under the guise of a drug sale in order to rob Hamilton and Coursey.

Hamilton and Coursey met Curry and Savage in a dark area behind the gas station. Curry and Savage exited their car, where Simuel remained seated. They approached the car in

which Hamilton and Coursey waited. Savage told Hamilton they did not have any marijuana, but demanded to see the money. Within minutes, Hamilton was shot and killed while still seated in his vehicle with Coursey. Curry and Savage fled in the waiting car driven by Simuel.

Curry, Savage, and Simuel were charged in connection with the robbery and Hamilton's murder. At Curry's trial, Coursey, Savage, and Simuel implicated Curry in Hamilton's murder. Coursey testified he had not met Curry, Savage, or Simuel before the night of the murder. He stated they first met around midnight in the dark parking lot of the apartment complex, a short time later at the apartment complex, and finally in the dark parking lot of the gas station where Hamilton was killed. He testified he called 911 after the shooting but was unable to provide many details about the perpetrators, telling the 911 dispatcher, "I don't know, it's dark[,] man, I just don't know." However, at trial Coursey testified Curry had the gun in his hand and that Savage never had possession of the gun. Moreover, he unequivocally identified Curry as the shooter.

Savage testified Curry carried a gun with him on the night of the murder and claimed he saw Curry fire the gun three or four times at the murder scene. Savage further testified that after the shooting, Curry and he fled in a car driven by Simuel. According to Savage, Curry exclaimed, "I think I dome capped him," implying he shot Hamilton in the head. Savage testified Curry later told him he had disposed of the murder weapon. Simuel largely corroborated Savage's testimony but did not provide an eyewitness account of Curry firing the gun.

Curry sought to question the motives and biases of Simuel and Savage by cross-examining them on the possible sentences they faced in connection with Hamilton's murder. When Curry questioned Simuel about the possible sentences he faced, the trial court sustained the State's objection and instructed the jury to disregard the testimony.

Prior to Savage's testimony, Curry asked the trial court *in limine* to allow impeachment of Savage on bias and motive by questioning him about the possible sentences he faced for charges related to Hamilton's death. The trial court denied

his request. In reaching its decision, the trial court considered Curry's request in light of *State v. Mizzell,* 349 S.C. 326, 563 S.E.2d 315 (2002), and stated:

> Under [the circumstances in *Mizzell*], sir, part of the problem I think in that case was that, as I read it, the witness was given an offer to plead to one particular charge versus the potential sentence, the maximum sentence on the other charges that the defendant would have faced had she been convicted or tried on the original charges, and we don't have that here. There's no deal between the State at all.

Curry later sought clarification, asking, "So the Court is ruling that he says he has no deal, then I am prohibited from asking about these penalties that he's facing, is that correct?" The trial court responded affirmatively. The trial court elaborated, "We're not going to bring him out here to elicit whether or not he knows what his potential sentences are. As I understand it there's no negotiations or deals between the State and this particular witness."

The jury convicted Curry on both charges. He received concurrent prison sentences of five years for the firearms charge and life in prison for the murder charge. This appeal followed.

## LAW/ANALYSIS

### I. Scope of Cross-examination

 Curry argues the trial court committed reversible error in denying his request to cross-examine Simuel and Savage concerning possible sentences he faced in connection with Hamilton's death.[1] We disagree.

---

1. Curry also argues the trial court erred in refusing to allow him to cross-examine Savage about pending criminal charges unrelated to Hamilton's murder. Curry never proffered the evidence or even attempted to proffer it. The evidence is not part of the record. Thus, the issue is not preserved. *See State v. Hawkins,* 310 S.C. 50, 54, 425 S.E.2d 50, 57 (Ct.App.1992) (declining to rule on alleged error in exclusion of evidence, where no proffer was made and excluded evidence was not part of record). Lastly, Curry argues the trial court erred in admitting evidence that he was incarcerated. This issue is not preserved for appellate review. *See State v. Dunbar,* 356 S.C. 138, 142, 587 S.E.2d 691, 694 (2003) ("A party may not argue one ground at trial and an alternate ground on appeal.").

To constitute error, a ruling to admit or exclude evidence must affect a substantial right. Rule 103(a), SCRE; *State v. Johnson*, 363 S.C. 53, 60, 609 S.E.2d 520, 524 (2005). However, error is harmless where it could not reasonably have affected the trial's outcome. *State v. Mitchell*, 286 S.C. 572, 573, 336 S.E.2d 150, 151 (1985). In considering whether error is harmless, a case's particular facts must be considered along with various factors including:

> . . . the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*State v. Clark*, 315 S.C. 478, 482, 445 S.E.2d 633, 635 (1994). Thus, an insubstantial error not affecting the result of the trial is harmless where "guilt has been conclusively proven by competent evidence such that no other rational conclusion can be reached." *State v. Bailey*, 298 S.C. 1, 5, 377 S.E.2d 581, 584 (1989). A violation of a defendant's Sixth Amendment right to confront a witness is not *per se* reversible error if the error is harmless beyond a reasonable doubt. *State v. Graham*, 314 S.C. 383, 385, 444 S.E.2d 525, 527 (1994).

In this case, Curry relied on *State v. Mizzell*, 349 S.C. 326, 563 S.E.2d 315 (2002), in support of his argument that he should be allowed to cross-examine his co-defendants as to any possible sentences they faced in connection with Hamilton's death. In *Mizzell*, our Supreme Court found error in the trial court's decision to exclude evidence of possible sentences faced by Mizzell's co-defendant where the parties faced the same charges and the co-defendant had not yet pled guilty or reached a plea agreement with the State. The court found:

> The fact the witness has yet to reach a plea bargain or been found guilty should not prevent the admission of such evidence. The lack of a negotiated plea, if anything, creates a situation where the witness is more likely to engage in biased testimony in order to obtain a future recommendation for leniency.

*Id.* at 333, 563 S.E.2d at 318.

Similar to the scenario in *Mizzell*, Curry's co-defendants faced the same charges as Curry and had not pled guilty or

reached a plea agreement. The trial court refused to allow Curry to cross-examine his co-defendants on the possible sentences they faced because Savage and Simuel had not pled guilty or reached a plea agreement with the State. We find this ruling contradicts the settled law established in *Mizzell*. Accordingly, we find the trial court erred in barring the cross-examination of Simuel and Savage on the possible sentences they faced.

■ However, the refusal to allow Curry to cross-examine his co-defendants on any possible sentences they faced in connection with Hamilton's death was harmless. At trial, the testimony given by the co-defendants was not the only evidence of Curry's involvement in the shooting of Hamilton. Ronald Coursey, the other victim of the robbery, unequivocally identified Curry as the shooter. He testified:

Coursey: And then the next I knew, he came up, Mr. Curry, over there had the gun.

Q: You saw Mr. Curry with the gun?

A: Yes, sir, he had the gun the whole time.

Q: What did he do with the gun?

A: ... he started shooting.

. . .

Q: Could you describe the gun?

A: ... it was either automatic or semi-automatic. It went off real fast.

Q: And how was [Curry] holding it?

A: In one hand.

Q: Okay. And so what did he say when he pulled the gun out?

A: I don't think he said anything, it just happened too fast and he shot and hit [Hamilton] in the head.

. . .

Q: Did you see who pulled the trigger?

A: Yes, sir. It was Mr. Curry over there.

Moreover, in addition to Coursey, Javon Rushon provided the following testimony regarding a conversation he overheard between Curry and Savage regarding the murder weapon:

Q: What specifically did you hear Mr. Curry—what if anything, did you hear Mr. Curry mention about the gun?

A: "They would never find it." "The hammer came off of it." You know, "It was chopped up."

On cross-examination, Rushon further clarified that it was in fact Curry who was talking about the gun, stating "Thaddeus Curry was talking to [Savage] about it."

The testimony of the co-defendants, Simuel and Savage, was merely cumulative to that given by Coursey and Rushon. As a result, Curry's guilt or innocence did not hinge solely on the testimony of his co-defendants; the testimony of Coursey and Rushon provided other competent evidence upon which a rational verdict of guilty could be based. Therefore, as the error on the part of the trial judge in limiting the scope of cross-examination could not have reasonably affected the outcome of the trial, it was harmless.

## II. Jury Charge

■ Curry next argues the trial court erred in its charge on "the hand of one is the hand of all" theory. We disagree.

■ "A charge is sufficient if, when considered as a whole, it covers the law applicable to the case." *State v. Ezell,* 321 S.C. 421, 425, 468 S.E.2d 679, 681 (Ct.App.1996). "The substance of the law is what must be charged to the jury, not any particular verbiage." *State v. Adkins,* 353 S.C. 312, 318–19, 577 S.E.2d 460, 464 (Ct.App.2003). "Jury instructions must be considered as a whole and, if as a whole, they are free from error, any isolated portions which might be misleading do not constitute reversible error." *State v. Jackson,* 297 S.C. 523, 526, 377 S.E.2d 570, 572 (1989).

At trial, Curry argued the court's proposed charge on "the hand of one is the hand of all" theory lacked "sufficient emphasis on the issue of probable or natural consequence...." Based on language drawn from *State v. Dickman,* 341 S.C. 293, 534 S.E.2d 268 (2000), Curry suggested the following charge:

[I]f two or more combine together to commit an unlawful act and a crime is committed by one of the actors as a **probable and natural consequence** of the acts done in pursuance of

the common design, all present and participating in the unlawful undertaking are as guilty as the one who committed the act.

(emphasis added).

The trial judge rejected Curry's proposed charge. He subsequently charged the jury twice on "the hand of one is the hand of all" theory. The first charge, which he gave along with the other charges prior to jury deliberations, stated:

It is my duty to charge you now that if a crime is committed by two or more people who are acting together in committing a crime, the act of one is the act of all. If a person joins with another to accomplish an illegal purpose, he is criminally responsible for everything done by the other person which occurs as a **natural consequence** of the acts done in carrying out the common plan and purpose.

After the jury left to deliberate, Curry renewed his objection to the charge on the basis that "the instruction as given did not convey to the jury that the act in this case, a homicide, must be a **natural or probable consequence** of the preexisting plan in order . . . for the theory of the hand of one, hand of all to apply. . . ." (emphasis added). The trial judge noted Curry's exception.

During its deliberation, the jury asked the court to recharge "the hand of one is the hand of all." The court brought the jury out and charged accomplice liability as follows, in pertinent part:

[I]f a crime is committed by two or more people who are acting together in committing a crime, the act of one is the act of all. I tell you further that a person who joins with another to accomplish an illegal purpose is criminally responsible for everything done by the other person which occurs as a **natural consequence** of the acts done in carrying out the common plan or purpose. When two or more people are acting together . . . assisting each other in committing the offense the act of one is the act of all, or as is sometimes said, the hand of one is the hand of all.

(emphasis added).

South Carolina courts frequently approve accomplice liability charges that lack language stating an accomplice's criminal act must be "a probable and natural consequence" of the

684

accomplice's common plan. For instance, in *State v. Langley,*
334 S.C. 643, 515 S.E.2d 98 (1999), our supreme court stated
that under "the hand of one is the hand of all" theory, "one
who joins with another to accomplish an illegal purpose is
liable criminally for everything done by his confederate inci-
dental to the execution of the common design and purpose."
In *State v. Kelsey,* 331 S.C. 50, 76–77, 502 S.E.2d 63, 76 (1998),
the supreme court approved a broader accomplice liability
charge that stated, ". . . if a crime is committed by two or
more persons who are acting together in the commission of a
crime, then the act of one is the act of both." Moreover, in
*State v. Crowe* our Supreme Court approved the following
charge for accomplice liability:

> [T]wo or more combine together to commit an unlawful act,
> such as robbery, and, in the execution of that criminal act, a
> homicide is committed by one of the actors, as a **probable
> or natural consequence** of the acts done in pursuance of
> the common design, all present participating in the unlawful
> undertaking are as guilty as the one who committed the
> fatal act. This principle was stated in *State v. Cannon,* 49
> S.C. 550, 27 S.E. 526: "The common purpose may not have
> been to kill and murder, but if it was unlawful, as, for
> instance, to break in and steal, and in the execution of this
> common purpose a homicide is committed by one, as a
> **probable or natural consequence** of the acts done in
> pursuance of the common design, then all present partici-
> pating in the unlawful common design are as guilty as the
> slayer."

258 S.C. 258, 265, 188 S.E.2d 379, 382 (1972) (emphases
added). Therefore, the approval of this charge demonstrates
that the "natural and probable consequence" language need
not be included in the charge, as requested by Curry, if the
charge as a whole adequately conveys the law. Additionally,
with the approval of the disjunctive "or" in the "probable or
natural consequence" language of *State v. Crowe,* the trial
court's charge arguably benefited Curry as it only included
the "natural consequences" rather than the "natural or proba-
ble" language.

Therefore, when viewing the challenged portion of the jury
charge as a whole with the rest of the trial court's instruction,

we find the trial court adequately charged the law regarding "hand of one hand of all."

## CONCLUSION

For the forgoing reasons, Curry's conviction is hereby **AFFIRMED.**

GOOLSBY, J. concurs.

ANDERSON, J. dissents in a separate opinion.

ANDERSON, J. (dissenting in a separate opinion).

I disagree with majority's reasoning and analysis. In my view, the trial court erred in (1) limiting his cross-examination of two co-defendants on sentencing exposure they faced for murder and other charges related to Hamilton's death; and (2) giving an erroneous charge on accomplice liability. I **VOTE** to **REVERSE.**

### *FACTUAL/PROCEDURAL BACKGROUND*

Shortly after midnight on March 18, 2003, Hamilton and Ronald Coursey drove to an apartment complex in Augusta, Georgia, to purchase marijuana. In the apartment complex parking lot, they encountered Curry and Anthony Savage and asked if they had any marijuana to sell. Curry and Savage said they had no marijuana, but agreed to procure and sell a quarter-pound to Hamilton and Coursey for $220.

Hamilton and Coursey drove to an ATM and withdrew money to pay for the drugs. Meanwhile, Curry, Savage, and Jeremy Simuel drove around Augusta looking for marijuana. They were unsuccessful. When they returned to the apartment complex, Hamilton and Coursey followed Curry, Savage, and Simuel to Simuel's apartment. Hamilton and Coursey waited outside the apartment while the others went inside and closed the door. They were soon informed the transaction would occur later.

Hamilton and Coursey left the apartment complex and went to Hamilton's home on Beech Island in Aiken County, where they smoked more marijuana and waited until Curry and Savage called. The parties spoke by phone and agreed to

meet at a gas station on Beech Island. Curry, Savage and Simuel failed to procure marijuana to sell Hamilton and Coursey, but apparently intended to meet under the auspices of a drug sale in order to rob Hamilton and Coursey of their money.

Hamilton and Coursey met Curry and Savage in a dark area behind the gas station. Curry and Savage exited their car, where Simuel remained seated. They approached the car in which Hamilton and Coursey waited. Savage told Hamilton they did not have any marijuana, but demanded to see the money. Within minutes, Hamilton was shot and killed while still seated in his vehicle. Curry and Savage fled in the waiting car driven by Simuel.

Curry, Savage and Simuel were all charged in connection with the robbery and Hamilton's murder. Curry was tried on the charges before a jury.

At trial, Coursey, Savage and Simuel implicated Curry in Hamilton's murder. Coursey attested that he saw Curry shoot Hamilton. He testified the first time he met Curry, Savage, and Simuel was the night of the murder when he saw them around midnight in the dark parking lot of the apartment complex, a short time later at the apartment complex, and finally in the dark parking lot of the gas station where Hamilton was killed. Coursey admitted he had been drinking alcohol and smoking marijuana throughout the evening. He averred he called 911 after the shooting but was unable to provide many details about the perpetrators, telling the 911 dispatcher, "I don't know, it's dark man, I just don't know." When he provided police a written statement one week later, he was only able to describe the gunman as "a black male with a white t-shirt on[.]"

Savage asseverated Curry carried a gun with him on the night of the murder, and claimed he saw Curry fire the gun three or four times at the murder scene. Savage further testified that after the shooting, Curry and he fled in a car driven by Simuel. According to Savage, Curry exclaimed, "I think I dome capped him," indicating he shot Hamilton in the head. Curry later told Savage he had disposed of the murder weapon. Simuel largely corroborated Savage's testimony, but did not provide an eyewitness account of Curry firing the gun.

Curry sought to question the motives and biases of Simuel and Savage by cross-examining them on the sentencing exposure they faced for Hamilton's murder. When Curry questioned Simuel about the potential sentences he faced, the trial court sustained the State's objection and instructed the jury to disregard the testimony.

Prior to Savage's testimony, Curry asked that he be allowed to show motive and bias by questioning Savage on the possible sentence he faced in connection with Hamilton's death. In reaching its decision, the trial court considered Curry's request in light of *State v. Mizzell*, 349 S.C. 326, 563 S.E.2d 315 (2002), and stated:

> Under [the circumstances in *Mizzell*], sir, part of the problem I think in that case was that, as I read it, the witness was given an offer to plead to one particular charge versus the potential sentence, the maximum sentence on the other charges that the defendant would have faced had she been convicted or tried on the original charges, and we don't have that here. There's no deal between the State at all.

Curry later sought clarification, asking, "So the Court is ruling that he says he has no deal, then I am prohibited from asking about these penalties that he's facing, is that correct?" The trial court responded affirmatively. Further, the trial court declined Curry's request to proffer the testimony: "We're not going to bring him out here to elicit whether or not he knows what his potential sentences are. As I understand it there's no negotiations or deals between the State and this particular witness."

The jury convicted Curry on both charges. He received concurrent prison sentences of five years for the firearms charge and life in prison for the murder charge.

## LAW/ANALYSIS

### I. Limitation of Cross–Examination

#### A. Confrontation Right

Curry argues the trial court committed reversible error in denying his request to cross-examine Savage and Simuel concerning the possible sentences they faced in connection with Hamilton's death. I agree.

688

"Among other protections, the Sixth Amendment assures: 'In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him[.]' U.S. Const. amend. VI." *State v. Davis*, 364 S.C. 364, 372, 613 S.E.2d 760, 764 (Ct.App.2005), *cert. granted* (Feb. 15, 2006). The Sixth Amendment was incorporated and made applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); *State v. Mizzell*, 349 S.C. 326, 563 S.E.2d 315 (2002); *Davis*, 364 S.C. at 372, 613 S.E.2d at 764. The right of confrontation is essential to a fair trial in that it promotes reliability in criminal trials and insures that convictions will not result from testimony of individuals who cannot be challenged at trial. *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970); *State v. Martin*, 292 S.C. 437, 439, 357 S.E.2d 21, 22 (1987); *State v. Gillian*, 360 S.C. 433, 602 S.E.2d 62 (Ct.App.2004), *cert. granted* (Feb. 16, 2006). The primary interest secured by the Confrontation Clause is the right to cross-examination. *Gillian* at 450, 602 S.E.2d at 71 (citing *State v. Shuler*, 344 S.C. 604, 545 S.E.2d 805 (2001); *Starnes v. State*, 307 S.C. 247, 414 S.E.2d 582 (1991)); *see also State v. Graham*, 314 S.C. 383, 444 S.E.2d 525 (1994) (observing that specifically included in defendant's Sixth Amendment right to confront a witness is the right to meaningfully cross-examine an adverse witness).

The Confrontation Clause guarantees an accused the opportunity to cross-examine a witness concerning bias. *Davis v. Alaska*, 415 U.S. 308, 319–20, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *State v. Brown*, 303 S.C. 169, 171, 399 S.E.2d 593, 594 (1991). Considerable latitude is allowed in cross-examining a witness for potential bias from which jurors could draw inferences relating to the witness's liability. *State v. Clark*, 315 S.C. 478, 481, 445 S.E.2d 633, 634 (1994); *Brown*, 303 S.C. at 171, 399 S.E.2d at 594. However, the Confrontation Clause does not preclude the trial court from limiting a defendant's inquiry into the potential bias of a prosecution witness. *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *Gillian*, 360 S.C. at 451, 602 S.E.2d at 72. Rather, the trial court retains broad discretion to impose reasonable limits on such cross-examination based on concerns about issues including harassment, prejudice, confusion of the issues,

witness safety, or interrogation that is repetitive or only marginally relevant. *Id.*

In *State v. Mizzell*, 349 S.C. 326, 563 S.E.2d 315 (2002), our supreme court found error in the trial court's decision to exclude evidence of possible sentences faced by the Mizzell brothers' co-defendants where all defendants faced the same charges and the co-defendants had not yet pled guilty or reached a plea agreement with the State. The Mizzell brothers were tried together on charges of first degree burglary, grand larceny, and possession of a firearm during the commission of a violent crime for breaking into the victim's home and stealing several guns. State's witness Donald Steele had been charged with the same crimes as the Mizzells. Steele testified that he and his wife drove the Mizzells to the victim's home and watched as they kicked in the door, entered the home, and returned carrying guns. On cross-examination, Steele admitted the State had charged him with the same crimes as the Mizzells. "The trial court excluded evidence of the possible sentence Steele faced but permitted petitioners to examine Steele about the sentence in general terms." 349 S.C. at 330, 563 S.E.2d at 317.

The issue for the court was whether the trial court had violated the defendants' confrontation rights by refusing to allow evidence of Steele's potential sentence if convicted of the same crimes as the Mizzells. The *Mizzell* court began by juxtaposing the right of a defendant to cross-examine a witness with the discretion of a trial judge to dictate reasonable limits on the scope of cross-examination:

A criminal defendant may show a violation of the Confrontation Clause "by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness.'" *Delaware v. Van Arsdall*, 475 U.S. 673, 680, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674, 684 (1986). The trial judge retains discretion to impose reasonable limits on the scope of cross-examination. *State v. Sherard*, 303 S.C. 172, 399 S.E.2d 595 (1991); *accord Delaware v. Van Arsdall, supra.* Before a trial judge may limit a criminal defendant's right to engage in cross-exami-

nation to show bias on the part of the witness, the record must clearly show the cross-examination is inappropriate. *State v. Graham, supra.* If the defendant establishes he was unfairly prejudiced by the limitation, it is reversible error. *State v. Brown, supra.*

*Mizzell,* 349 S.C. at 331, 563 S.E.2d at 317. The court elaborated that "[t]he jury is, generally, not entitled to learn the possible sentence of a defendant because the sentence is irrelevant to finding guilt or innocence." *Id.* at 331, 563 S.E.2d at 318. "However," the court intoned, "other constitutional concerns, such as the Confrontation Clause, limit the applicability of this rule in circumstances where the defendant's right to effectively cross-examine a co-conspirator witness of possible bias outweighs the need to exclude the evidence." *Id.* at 331–32, 563 S.E.2d at 318.

The court discussed *State v. Brown,* 303 S.C. 169, 399 S.E.2d 593 (1991), a case in which a witness admitted she testified in exchange for a conspiracy charge which carried a seven and one-half year maximum sentence, rather than a trafficking in cocaine charge. The trial judge refused to allow the defense to cross-examine the witness as to the maximum punishment she would have faced under the trafficking charge. The *Brown* court found that evidence the witness was avoiding a mandatory prison term of "more than three times the duration she would face on her plea to conspiracy" constituted "critical evidence of potential bias that appellant should have been permitted to present to the jury." *Brown,* 303 S.C. at 171, 399 S.E.2d at 594. Further, the witness's testimony was the only evidence linking Brown to trafficking cocaine.

The *Mizzell* court noted that unlike in *Brown,* Steele did not have a deal with the State. However, the court concluded that the lack of an agreement with the prosecution would make the potential for witness bias even more likely:

> The fact the witness has yet to reach a plea bargain or been found guilty should not prevent the admission of such evidence. The lack of a negotiated plea, if anything, creates a situation where the witness is more likely to engage in biased testimony in order to obtain a future recommendation for leniency.

*Mizzell,* 349 S.C. at 333, 563 S.E.2d at 318. Thus, *Mizzell* stands for the proposition that the lack of an agreement with the State may increase the likelihood of witness bias where the witness has been charged with the same crimes as the defendant.

Similar to the scenario in *Mizzell,* Curry's co-defendants faced the same charges as Curry and had not pled guilty or reached a plea agreement. Here, the trial court refused to allow Curry to cross-examine his co-defendants on their sentencing exposure because Savage and Simuel had not pled guilty or reached a plea agreement with the State. This ruling contradicts the law established in *Mizzell.*

*State v. Gillian,* 360 S.C. 433, 602 S.E.2d 62 (Ct.App.2004), *cert. granted* (Feb. 16, 2006), likewise addressed the Confrontation Clause in the context of questioning a witness on a potential sentence. Gillian was convicted of murder. He had coordinated a burglary and recruited several teenagers, including State's witness Page, to break into the home. Among the items stolen was a .38 revolver which was later used to kill the victim, Michael Ward. At Gillian's trial, Page testified to Gillian's possession of the gun, to Gillian's statement that he was going to "do some dirt" with it, and to an altercation between Gillian and the victim on the night of the murder. "On direct examination, Page admitted he was currently charged with first-degree burglary and the Richland County Solicitor had agreed to advise his plea judge of his cooperation in Gillian's trial." 360 S.C. at 449, 602 S.E.2d at 70. Defense counsel sought to cross-examine Page on the possible sentence he faced, but the trial judge limited references to the sentence to "a lot of time" and "serious time." *Id.* Relying on *Mizzell* and *State v. Sims,* 348 S.C. 16, 558 S.E.2d 518 (2002), we inculcated:

Included in the Confrontation Clause protection is the right to cross-examine any State's witness as to possible sentences faced when there exists "a substantial possibility [the witness] would give biased testimony in an effort to have the solicitor highlight to [a] future [court]" how the witness cooperated in the instant case. *See Sims,* 348 S.C. at 25, 558 S.E.2d at 523; *see also Mizzell,* 349 S.C. at 332–33, 563 S.E.2d at 318.

*Gillian,* 360 S.C. at 454, 602 S.E.2d at 73. Accordingly, we found the trial court had erred in excluding evidence of Page's potential sentence.

Apodictically, a defendant has a protected right under the Sixth Amendment's Confrontation Clause to cross-examine a witness as to the possible sentence he faces where there exists a substantial possibility of bias. In the case *sub judice,* where the witnesses were charged with the same crimes as the co-defendant against whom they were testifying, the requisite potential for bias was present. Curry had a right to question on the possible sentences Simuel and Savage were facing, and the trial court erred by refusing this inquiry.

## B. Harmless Error Analysis

A determination that the trial court committed error does not end the inquiry. A violation of a defendant's Sixth Amendment right to confront a witness is not *per se* reversible error if the error is harmless beyond a reasonable doubt. *State v. Graham,* 314 S.C. 383, 385, 444 S.E.2d 525, 527 (1994). In *State v. Gillian,* 360 S.C. 433, 454, 602 S.E.2d 62, 73 (Ct.App.2004), *cert. granted* (Feb. 16, 2006), this Court stated the law of harmless error with exactitude:

No definite rule of law governs the finding that an error was harmless; rather, the materiality and prejudicial character of the error must be determined from its relationship to the entire case. *State v. Reeves,* 301 S.C. 191, 391 S.E.2d 241 (1990); *State v. Mitchell,* 286 S.C. 572, 336 S.E.2d 150 (1985); *State v. Pagan,* 357 S.C. 132, 591 S.E.2d 646 (Ct. App.2004). Whether an error is harmless depends on the particular facts of each case and upon a host of factors, including:

the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and of course the overall strength of the prosecution's case.

*Mizzell,* 349 S.C. at 333, 563 S.E.2d at 318–19 (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)).

"Harmless beyond a reasonable doubt" means the reviewing court can conclude the error did not contribute to the verdict beyond a reasonable doubt. *Mizzell,* 349 S.C. at 334, 563 S.E.2d at 319; *Arnold v. State,* 309 S.C. 157, 420 S.E.2d 834 (1992). "In determining whether an error is harmless, the reviewing court must review the entire record to determine what effect the error had on the verdict." *Mizzell,* 349 S.C. at 334, 563 S.E.2d at 319 (internal quotations omitted).

Error is harmless where it could not reasonably have affected the result of the trial. *In re Harvey,* 355 S.C. 53, 584 S.E.2d 893 (2003); *Mitchell,* 286 S.C. at 573, 336 S.E.2d at 151; *State v. Burton,* 326 S.C. 605, 486 S.E.2d 762 (Ct.App.1997). Generally, appellate courts will not set aside convictions due to insubstantial errors not affecting the result. *State v. Sherard,* 303 S.C. 172, 399 S.E.2d 595 (1991); *State v. Adams,* 354 S.C. 361, 580 S.E.2d 785 (Ct.App.2003). Thus, an insubstantial error not affecting the result of the trial is harmless where guilt has been conclusively proven by competent evidence such that no other rational conclusion can be reached. *State v. Bailey,* 298 S.C. 1, 377 S.E.2d 581 (1989); *Adams,* 354 S.C. at 381, 580 S.E.2d at 795; *see also State v. Kelley,* 319 S.C. 173, 460 S.E.2d 368 (1995) (noting that when guilt is conclusively proven by competent evidence, such that no other rational conclusion could be reached, this Court will not set aside conviction for insubstantial errors not affecting result).

*Gillian,* 360 S.C. at 454–55, 602 S.E.2d at 74–75.

The *Mizzell* court found the erroneous limitation of the cross-examination of a witness constituted reversible error under the facts of that case. *Mizzell,* 349 S.C. at 334, 563 S.E.2d at 319. The court noted the witness's testimony provided the only direct link between the defendant and the crime scene. Moreover, no physical evidence linked the defendant to the crime scene. In fact, nothing else corroborated the State's case.

Conversely, in *State v. Sims,* 348 S.C. 16, 26, 558 S.E.2d 518, 523 (2002), our supreme court found harmless error where the State's case was "strong" without the witness's testimony and exclusion of the testimony could not possibly have affected the

trial's outcome. In considering the strength of the State's case, the *Sims* court noted the defendant's fingerprints were found at the crime scene, the victim's mother testified Sims threatened the victim on the date of her death, and Sims had "spontaneously confessed" to law enforcement officers investigating the incident. *Id.*

This Court found harmless error in *Gillian,* where the witness's testimony was "largely cumulative" to testimony from other witnesses and other evidence suggested Gillian's guilt. *Gillian,* 360 S.C. at 457–58, 602 S.E.2d at 74–75. We distinguished the facts in *Gillian* from those in *Mizzell,* noting the absence of the witness's testimony left "no material point of the State's case uncorroborated or unsupported by the testimony of other witnesses." *Id.* at 458, 602 S.E.2d at 75.

Here, Simuel and Savage's testimony was critical to the case's outcome. They testified to Curry's motive; to his possession of a gun similar to that used in the shooting; to his conduct before and after the shooting; and to self-incriminating statements Curry made about discarding the weapon. Most significantly, Savage testified to seeing Curry fire the gun. Without their testimony, the only evidence linking Curry to the crime scene is Coursey's vague and unspecific testimony. Coursey provided few details of the gunman in the description he provided to the 911 dispatcher immediately after the shooting and in his written statement to police made one week later. Coursey testified the shooting occurred in a dark area, and that he met Curry and Savage for the first time hours before in another dark location. Moreover, Coursey testified he observed the shooting after spending several hours drinking alcohol and smoking marijuana. Consequently, the testimony of Simuel and Savage provided the crucial nexus establishing Curry as the gunman.

Accordingly, the trial court's error in limiting Curry's cross-examination could have reasonably affected the outcome of the trial. The error was not harmless.

## II. Accomplice Liability Charge

Additionally, Curry maintains the trial court's charge on the hand of one is the hand of all theory was inadequate because it failed to specify that a crime committed by an accomplice must

be a "probable or natural consequence" of the actions taken in pursuit of the accomplices' common plan. I agree. Although the court's charge included the words "natural consequence," the charge should have included both "natural" and "probable."

At trial, Curry argued the court's proposed charge on "the hand of one is the hand of all" theory lacked "sufficient emphasis on the issue of probable or natural consequence[.]" Based on language drawn from *State v. Dickman*, 341 S.C. 293, 534 S.E.2d 268 (2000), Curry suggested the following charge:

> [I]f two or more combine together to commit an unlawful act and a crime is committed by one of the actors as a **probable and natural consequence** of the acts done in pursuance of the common design, all present and participating in the unlawful undertaking are as guilty as the one who committed the act.

(Emphasis added.)

The trial judge rejected Curry's proposed charge and subsequently charged the jury twice on "the hand of one is the hand of all" theory. The first charge, which the judge gave along with the other charges prior to jury deliberations, stated:

> It is my duty to charge you now that if a crime is committed by two or more people who are acting together in committing a crime, the act of one is the act of all. If a person joins with another to accomplish an illegal purpose, he is criminally responsible for everything done by the other person which occurs as a **natural consequence** of the acts done in carrying out the common plan and purpose.

(Emphasis added.) After the jury left to deliberate, Curry renewed his objection to the charge on the basis that "the instruction as given did not convey to the jury that the act in this case, a homicide, must be a **natural or probable consequence** of the preexisting plan in order . . . for the theory of the hand of one, hand of all to apply. . . ." (emphasis added). The trial judge noted Curry's exception.

During its deliberations, the jury asked the court to recharge "the hand of one is the hand of all." The court brought the jury out and charged accomplice liability as follows:

> ... if a crime is committed by two or more people who are acting together in committing a crime, the act of one is the act of all. I tell you further that a person who joins with another to accomplish an illegal purpose is criminally responsible for everything done by the other person which occurs as a **natural consequence** of the acts done in carrying out the common plan or purpose. When two or more people are acting together ... assisting each other in committing the offense the act of one is the act of all, or as is sometimes said, the hand of one is the hand of all.

(Emphasis added.) After re-charging the jury on additional areas of law, including mere presence, the trial judge sent the jury back for continued deliberation. The judge stated to Curry's counsel, "I note your continuing objection to the charge on hand of one as stated earlier."

Curry argues the accomplice liability charge erroneously failed to specify that an accomplice's crime must be "a probable and natural consequence" of actions taken in pursuit of the accomplices' shared plan. The language advanced by Curry limits criminal liability for an accomplice's actions that are inconsequential to the execution of their common scheme or plan. As one treatise explains:

> When several persons are involved in the perpetration of one crime, and one of them goes outside the common purpose for which they combined or conspired in committing a fatal act which is not a **natural and probable consequence** of carrying out the common purpose, the others are not criminally liable for the homicide. There is a requirement of a direct causal connection between the underlying felony and the homicide which is something more than mere coincidence in time and place between the two. The actual legal relation between the killing and the crime committed or attempted must be such that the killing can be said to have occurred as a part of the perpetration of the crime, or in furtherance of an attempt to commit it; that is, the fatal act must have been the ordinary, probable, or necessary result or effect of the execution of the conspiracy, or of the concerted action, in which the defendant participated.

> Whether or not the act done was in furtherance of the common design, or whether it was a **natural and probable**

**consequence** flowing from the execution of the common design is always a question for the jury.

3 Am.Jur. Proof of Facts 2d 551, *Homicide Outside of Common Design*, 6 (2005) (emphasis added).

Our courts have approved of accomplice liability charges that lack language stating an accomplice's criminal act must be "a probable and natural consequence" of the accomplices' common plan. For instance, in *State v. Langley*, 334 S.C. 643, 648, 515 S.E.2d 98, 101 (1999), our supreme court stated that under "the hand of one is the hand of all" theory, "one who joins with another to accomplish an illegal purpose is liable criminally for everything done by his confederate **incidental** to the execution of the common design and purpose." (Emphasis added.) In *State v. Kelsey*, 331 S.C. 50, 76–77, 502 S.E.2d 63, 76 (1998), the supreme court approved a broader accomplice liability charge that stated, "... if a crime is committed by two or more persons who are acting together in the commission of a crime, then the act of one is the act of both."

However, other cases present accomplice liability charges that include the language Curry requests. In *State v. Crowe*, 258 S.C. 258, 265, 188 S.E.2d 379, 382 (1972), our supreme court described accomplice liability as where

> ... two or more combine together to commit an unlawful act, such as robbery, and, in the execution of that criminal act, a homicide is committed by one of the actors, as a **probable or natural consequence** of the acts done in pursuance of the common design, all present participating in the unlawful undertaking are as guilty as the one who committed the fatal act. This principle was stated in *State v. Cannon*, 49 S.C. 550, 27 S.E. 526: "The common purpose may not have been to kill and murder, but if it was unlawful, as, for instance, to break in and steal, and in the execution of this common purpose a homicide is committed by one, as a **probable or natural consequence** of the acts done in pursuance of the common design, then all present participating in the unlawful common design are as guilty as the slayer."

(Emphasis added.)

In *State v. Peterson*, 287 S.C. 244, 335 S.E.2d 800 (1985), *rev'd on other grounds by State v. Torrence*, 305 S.C. 45, 406

S.E.2d 315 (1991), our supreme court considered the necessity of the "probable or natural consequence" language in an accomplice liability charge. *Peterson* involved the joint appeal of two accomplices who appealed their convictions for murder, armed robbery, grand larceny of a motor vehicle, and conspiracy. The court stated:

The trial judge's charge was a correct statement of the general law of this jurisdiction concerning accomplice liability. In the present case, however, the jury reasonably could have found that the murder was not the probable or natural consequence of the larceny of a motor vehicle.

Had the jury determined that either appellant conspired only to commit an unarmed larceny of a car, and had it further concluded that the state failed to establish beyond a reasonable doubt that a homicide was the natural or probable consequence of a plan to steal the victim's car, the appellant would have been entitled to an acquittal on the charge of murder.

**It was therefore essential under the facts and circumstances of this case that the jury be instructed that it had to find that the homicide was a natural or probable consequence of the acts actually agreed on by the appellants before the law would hold him responsible for such a homicide.** The failure of the trial judge to so instruct was error because it permitted the jury to convict an appellant of murder merely by finding (1) that appellant had combined with another to commit the non-life threatening crime of grand larceny of a motor vehicle and (2) that appellant's accomplice thereafter took a life without appellant's prior knowledge, approval, or assistance.

*Peterson*, 287 S.C. at 246–47, 335 S.E.2d at 801–02 (emphasis added).

Thus, the facts and circumstances of a particular case ultimately dictate whether an accomplice liability charge must instruct the jury that an accomplice's actions be a "natural or probable consequence" of actions taken in pursuit of the accomplices' shared plan.

I would hold that here, as in *Peterson*, the facts and circumstances warrant the language requested by Curry. Evidence presented at trial suggested the possibility that the

codefendants met Hamilton and Coursey under the pretense of selling them marijuana, but in fact had no marijuana to sell and only intended to rob them of their money. The testimony is not conclusive that the codefendants agreed to use weapons to accomplish the crime; only that one of them apparently had the intention and shot Hamilton during the commission of the crime. Had the jury determined that either codefendant conspired **only** to commit an unarmed robbery and had it further concluded that the State failed to establish beyond a reasonable doubt that a homicide was the natural or probable consequence of the robbery, the appellant would have been entitled to an acquittal on the charge of murder. *Crowe* and *Peterson* utilize both "natural" and "probable." Each word has a different meaning. Accordingly, the use of both words was necessary in the case *sub judice*. The court's failure to include the word "probable" here renders the charge inadequate.

Curry further alleges the trial court erred (1) by refusing to allow him to cross-examine Savage on possible sentence he faced for pending charges unrelated to Hamilton's death; (2) by allowing testimony regarding alleged bad acts; and (3) by allowing the State to elicit testimony that Curry was in jail at the time of the trial. Because I would reverse on the Confrontation Clause and accomplice liability charge issues, I decline to address these issues. I **VOTE** to **REVERSE.**