**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

The State, Respondent,

v.

Damon Ellis Moody, Appellant.

Appellate Case No. 2014-001391

---

Appeal From Florence County
D. Craig Brown, Circuit Court Judge

---

Opinion No. 2019-UP-211
Heard March 9, 2017 – Filed June 12, 2019

---

**AFFIRMED**

---

Rose Mary Parham, of Parham Law Firm, LLC, of
Florence, for Appellant.

Attorney General Alan McCrory Wilson, Senior
Assistant Deputy Attorney General John Benjamin Aplin,
and Senior Assistant Deputy Attorney General William
M. Blitch, Jr., all of Columbia; and Solicitor Edgar Lewis
Clements, III, of Florence, all for Respondent.

---

**PER CURIAM:** Damon Moody appeals his convictions for pointing and presenting a firearm, arguing the circuit court erred in (1) precluding Moody from

cross-examining his mother-in-law about the dismissal of certain criminal charges; (2) precluding Moody from cross-examining one of the victims about a dismissed assault charge; (3) denying Moody immunity under the Protection of Persons and Property Act;[1] and (4) refusing to charge the jury on the defense of habitation. As we find any error was harmless, we affirm.

**Facts and Procedural History**

Moody and his mother-in-law, Tabitha Durant, live separately on a shared piece of property owned by Durant's father. Moody is married to one of Durant's daughters. The two mobile homes are arranged in an L-shape—the back door of Moody's home opens into a shared backyard, and Durant has a swimming pool beside her home. There is no fence between the homes or dividing the backyard.

On June 13, 2013, Jermichael Wright—who is engaged to Durant's other daughter— invited members of his basketball team and family, including his brother, Jermaine Wright, to Durant's home for a pool party and cookout. Several children attended, including Durant's three-year-old son and four-year-old grandson, a thirteen-year-old member of Jermichael's basketball team, and Jermichael's eleven and fourteen-year-old cousins. Jermichael also brought Sire, his young pit bull. Sire was running around loose in the shared backyard during the party.

Jermichael and Jermaine (the Wrights) were cleaning the grill on Durant's patio when they heard gunshots; Moody was standing on his back porch firing a handgun into the ground. Children were in the pool, which was approximately fifteen yards from Moody's porch, and Sire was running toward the Wrights. Jermichael testified that when he heard Moody threaten to put a bullet in his "f****** dog's head," he told Moody not to "come out here talking like—talking like that in front of my family."

Moody walked over to Durant's patio to address the dog situation, and Jermaine pushed him back, away from the pool area. Moody then returned to his own home and emerged with his dog, Sniper. Another altercation with the Wrights ensued. Although Moody admitted he pulled a different handgun on the Wrights at that point, his testimony about the events leading up to the fracas differed from the Wrights' accounts. According to Moody, his dogs woke him after he had worked a

_____

[1] S.C. Code Ann. §§ 16-11-410 to -450 (2015).

night shift, so he let them go outside.[2]  Shortly thereafter, Moody looked outside and saw Sire snarling beside the kennels and trying to bite at the fence near one of his Belgian Malinois.  Sire had caused problems on at least five prior occasions on Moody's property.  Moody admitted he grabbed his .22 and fired several shots into the ground from his porch to scare Sire away because even after Moody yelled at him, Sire continued to bite at a female dog.[3]  Moody further admitted he yelled at Jermichael to come get his "f***** dog," but he denied ever threatening to shoot Sire.

Moody testified that even after he went back inside his own home, Jermichael continued to yell at him from Durant's patio.  So, he put away his gun and walked over to the patio to discuss the situation.  Moody claimed that while he was standing on Durant's patio steps, the Wrights became aggressive with him and "got in his face."  Moody again told Jermichael to control Sire because the dog continued to cause problems despite his previous complaints to both Jermichael and Durant.[4]  At this point, Jermichael told Moody not to "disrespect" him in front of his family and moved closer to him.  Moody admitted he made the first physical contact by using his forearm to move Jermichael back in an effort to create some distance.  Jermaine then pushed Moody off the patio.  Moody got up and told Jermichael he did not want to have another conversation about Sire.  He then heard Jermaine say "let's just knock this motherf**** out," but Jermichael told Jermaine "no" and told Moody to go on back home.

As Moody returned to his home, he noticed Sniper was "very bad off" due to the heat and activity, so he got a leash and took Sniper out of the kennel to cool off.  In addition to getting the leash, Moody put a .380 in his pocket for protection.  When Moody started to walk Sniper from his kennel to a water hose, he heard Jermichael say "if you bring that dog over here, I'm going to put one in your f*****g head and

---

[2] Moody kept two German Shepherds inside and four Belgian Malinoises outside in kennels in a sectioned-off area of the shared yard.  Moody trained the Malinoises for military and police use, and his work with the dogs involved significant time and money.

[3] Jermichael conceded Sire could have been around Moody's kennels when Moody fired the shots from his porch into the ground.

[4] Durant admitted Moody had complained to her about Jermichael's pit bull on one prior occasion.

one in that dog's head."  Moody claimed Jermichael then made a "furtive movement like he was concealing something in his back and his hand actually went behind him."  Moody responded by drawing his weapon and shouting, "Hands, hands, hands.  Show me your hands!"[5]  Moody testified he would not have pulled his gun had he not observed Jermichael make the "furtive" movement after threatening to shoot both Moody and his dog.  Moody did not deny pointing his gun at the Wrights and claimed he was about two feet from his own home when this occurred.  Moody further testified he had previously seen Jermichael with a gun at Durant's home.[6]

The partygoers' stories differ.  Jermichael testified that when Moody approached during their first encounter, Moody stood on the patio steps with his head level with Jermichael's chest and "got up in [Jermichael]'s face, and [Moody] was like, what are you going to do?"  Although Jermaine admitted he told Moody to get out of his brother's face and pushed him off the steps, he testified he only pushed Moody after "[Moody] got so close that his nose was touching [Jermaine's] nose."  Jermichael testified that at this point, Jermaine and Moody were "chest bumping" around the yard.  Jermichael stated, "[T]he next thing you know, [Moody] was like, all right, I got something for y'all, y'all wait right here."  Moody then went back to his home, and the Wrights returned to Durant's patio.

About three minutes later, Jermichael saw Moody walk outside with a leash over his shoulder and go to his kennels where he kept the four police dogs.  Moody put Sniper on the leash and walked toward the patio.  Jermichael recognized Sniper as an "attack dog" from video recordings of Sniper's training and believed the dog was vicious.  When Moody reached the side of the pool closest to Moody's home, he pulled a different gun—not the .22 he used earlier to scare Sire.  The second gun had a red laser pointer, which Moody pointed at the Wrights.  Jermichael admitted Moody was still on his own property when he pointed the gun at them

_____

[5] At the time of this incident, Moody was a police officer at Francis Marion University.  Moody previously worked as a correctional officer at the Florence County Detention Center and as a police officer with the Hartsville and Mullins police departments.

[6] Jermichael admitted on cross-examination that Moody knew he sometimes carried a gun and that he had shown Moody the gun on a prior occasion.  However, he further testified he did not have a gun at the party and he had nowhere to keep a gun that day because he was wearing swim trunks with no shirt while at the pool.

and that he and his brother were "trash talking Moody." However, he denied that either he or his brother told Moody they were "going to put a bullet between your dog's eyes and your eyes."

Durant witnessed the initial confrontation between Moody and the Wrights but claimed she did not see anyone push Moody off the porch. She testified that when Moody returned outside and walked back to her porch, she heard Moody tell a teenager "he would kill him and his cousins." She also stated she never heard the Wrights, or anyone at her home, threaten Moody.

After Moody pointed the handgun, Jermaine told everyone in the pool to go inside while Jermichael called 911. During the 911 call, Jermichael said he could see Moody, still holding the gun, talking to Durant while walking back and forth in front of her patio. Jermichael asked the 911 operator to send the police because Moody "was still outside and there's kids around the pool and he['s] got a gun out there with a big dog like he's going to sic the dog on somebody."[7] Moody returned to his home after Durant told him the police had been called.

The Florence County Sheriff's Office (FCSO) responded to the scene, interviewed witnesses, and filed reports. Although officers did not arrest Moody that day, they arrested Durant's husband (Husband) for interfering with their investigation. The South Carolina Law Enforcement Division (SLED) took over the continued investigation due to Moody's employment with local law enforcement.

Forty-five minutes after Durant's initial interview with SLED agent John Follin, Durant called Follin to report that Jermichael was known to carry a gun. At trial, Durant claimed she only made this call because "[she] talked to Moody and he—it was brought to [her] attention that he felt like it was a need." She also testified in a pretrial hearing that about two months before the trial, Moody told Durant if he went to jail, they were all "going down."

Pretrial, Moody questioned Durant about her recent arrest for breach of trust. Durant was charged with felony conspiracy to commit insurance fraud and breach of trust with fraudulent intent ($2,000–$10,000) for her involvement with Husband's filing of a false report with his insurance company. According to Moody, the FCSO arrested Durant after Moody provided them with two recorded conversations in which Durant admitted to the fraud. Although Durant was

___

[7] A transcript of the 911 call is consistent with Jermichael's testimony.

charged in December 2012, and claimed she completed pretrial intervention (PTI) in February 2013, she did not receive a letter releasing her from PTI until the week before Moody's 2014 trial.

The FCSO had recently dismissed a charge against Husband as well. Husband was charged with breach of the peace after he got upset that Moody was not arrested when police responded on the day of the pool party incident. Durant claimed Husband's charge was dismissed because "[o]n his trial date, no one showed up and all charges were dismissed."

The State also dismissed a charge against Jermichael. Moody testified the FCSO arrested Jermichael for assault and battery a few months after the pool party incident for assaulting a disabled man who had to be hospitalized after the attack. Moody claimed this charge, too, was dismissed and expunged after Jermichael completed PTI.

Moody sought to cross-examine Jermichael and Durant about the various dismissed charges to show their potential biases in favor of the State. The circuit court did not permit Moody to cross-examine Jermichael as to his assault charge or Durant as to her charges, the PTI for which she received a letter of completion one week before Moody's trial, the fact that Moody reported Durant's insurance fraud and provided her tape recorded statements to law enforcement, or the solicitor's office's recent dismissal of Husband's charges arising from the patio incident.

Following a jury trial, Moody was convicted of two counts of pointing and presenting a firearm and acquitted of a third. On the first count, the circuit court sentenced Moody to five years' imprisonment, suspended upon the service of forty-five days and two years' probation. As to the second count, the circuit court imposed a consecutive sentence of five years' imprisonment, suspended upon the service of forty-five days and three years' probation.

**Standard of Review**

"This [c]ourt will not disturb a trial court's ruling concerning the scope of cross-examination of a witness to test his or her credibility, or to show possible bias or self-interest in testifying, absent a manifest abuse of discretion." *State v. Gracely*, 399 S.C. 363, 371, 731 S.E.2d 880, 884 (2012). "An abuse of discretion occurs when the trial court's ruling is based on an error of law or is based on findings of fact that are without evidentiary support." *State v. Perez*, 423 S.C. 491, 496–97, 816 S.E.2d 550, 553 (2018).

**Law and Analysis**

**I. Cross Examination**

Moody argues the circuit court violated his rights under the Confrontation Clause of the Sixth Amendment by precluding him from cross-examining Durant and Jermichael about their arrests and subsequent pretrial diversion agreements. As to certain limitations upon Durant's cross-examination, we agree.

The Confrontation Clause provides, "In all criminal prosecutions, the accused shall enjoy the right to . . . be confronted with the witnesses against him." U.S. Const. amend. VI. "The Confrontation Clause guarantees a defendant the opportunity to cross-examine a witness concerning bias." *Gracely*, 399 S.C. at 372, 731 S.E.2d at 885; *see also* S.C. Const. art. I, § 14 ("Any person charged with an offense shall enjoy the right . . . to be confronted with the witnesses against him . . . ."). "Before a trial judge may limit a criminal defendant's right to engage in cross-examination to show bias on the part of the witness, the record must clearly show the cross-examination is inappropriate." *State v. Mizzell*, 349 S.C. 326, 331, 563 S.E.2d 315, 317 (2002). "If the defendant establishes he was unfairly prejudiced by the limitation, it is reversible error." *Id.*

> Considerable latitude is allowed in the cross-examination of a witness for potential bias. On cross-examination, *any fact* may be elicited which tends to show interest, bias, or partiality of the witness. The appropriate question under a Confrontation Clause analysis is whether there has been any interference with the defendant's opportunity for effective cross-examination at trial.

*State v. Gillian*, 360 S.C. 433, 450–51, 602 S.E.2d 62, 71 (Ct. App. 2004) (emphasis added) (citations omitted), *aff'd as modified*, 373 S.C. 601, 646 S.E.2d 872 (2007).

> A criminal defendant may show a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby to expose

> to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.

*State v. Pradubsri*, 403 S.C. 270, 276–77, 743 S.E.2d 98, 102 (Ct. App. 2013) (alteration by court) (quoting *Mizzell*, 349 S.C. at 331, 563 S.E.2d at 317).

## A. Evidence of Bias under Rule 608(c), SCRE

"Bias, prejudice or any motive to misrepresent may be shown to impeach the witness either by examination of the witness or by evidence otherwise adduced." Rule 608(c), SCRE. "Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." *State v. McEachern*, 399 S.C. 125, 140–41, 731 S.E.2d 604, 612 (Ct. App. 2012) (quoting *State v. Pipkin*, 359 S.C. 322, 327, 597 S.E.2d 831, 833 (Ct. App. 2004)). "Rule 608(c), SCRE, 'preserves South Carolina precedent holding that generally, "anything having a legitimate tendency to throw light on the accuracy, truthfulness, and sincerity of a witness may be shown and considered in determining the credit to be accorded his testimony."'" *Id.* at 141, 731 S.E.2d at 612 (quoting *State v. Jones*, 343 S.C. 562, 570, 541 S.E.2d 813, 817 (2001)).

In *State v. Sims*, our supreme court found the circuit court improperly prevented a defendant from cross-examining a witness about potential bias relating to certain charges pending against the witness. 348 S.C. 16, 25, 558 S.E.2d 518, 523 (2002). Although the State had not promised the witness a deal in exchange for his testimony, the witness "had been told when he went to trial on the charges, the State would tell the trial judge he had cooperated by testifying in the instant case." *Id.* at 24, 558 S.E.2d at 522. The circuit court allowed Sims to ask the witness whether he had pending charges and whether the State had promised him anything in relation to the charges. *Id.* However, the circuit court did not allow Sims to question him about the crimes with which he was charged. *Id.* The supreme court found the trial court erred in limiting Sims's cross-examination of this witness because based on the charges pending against the witness and his potential sentence, "[t]here was the substantial possibility [the witness] would give biased testimony in an effort to have the solicitor highlight to his future trial judge how he had cooperated in the instant case." *Id.* at 25, 558 S.E.2d at 523.

Our supreme court more recently addressed cross-examination for bias in *Smalls v. State*, an action for post-conviction relief. 422 S.C. 174, 810 S.E.2d 836 (2018).

The court found Smalls's counsel was ineffective for failing to argue, on the record, that evidence of a witness's carjacking charge the State had dismissed on the morning of trial was admissible as evidence of the witness's bias. Citing *Sims*, the supreme court explained "[i]f the mere existence of the charge made it likely [a witness] would give biased testimony . . . the dismissal of the charge made the likelihood of bias manifest—because [the witness] actually received the benefit he hoped the solicitor would provide in exchange for his cooperation." *Smalls*, 422 S.C. at 183, 810 S.E.2d at 841. The court noted that in failing to ask the trial court whether the witness could be impeached through the dismissed charge, Smalls's counsel failed to "recogniz[e] that the dismissal of the charge was potentially stronger evidence of bias than the charge itself . . . ." *Id.* at 182, 810 S.E.2d at 840.

Moody sought to cross-examine Durant about her own dismissed charges—as well as the dismissal of Husband's charge from the day of the pool party incident—in order to expose just such bias. All of the dismissed charges were brought by the FCSO and prosecuted by the Twelfth Circuit Solicitor's Office—the same way in which Moody's charges originated. We find it immaterial that Moody's charges were later transferred to the Attorney General's (AG's) office because, ultimately, the State of South Carolina prosecuted them all—until Durant and Jermichael were permitted to participate in PTI, and Husband's charge was dismissed "because nobody showed up." From the dismissals, the jury could have inferred that these witnesses were biased in favor of the State due to the favorable treatment they received from the solicitor's office that originally had jurisdiction over Moody's case. Further, we find it odd that although Durant claimed to have completed PTI in February 2013 for her December 2012 felony conspiracy to commit insurance fraud and breach of trust charges, she did not receive a letter releasing her from PTI until the week before Moody's July 2014 trial.

Significantly, although Durant testified at the pretrial hearing that both of her charges were eligible for expungement, the State presented no evidence that any expungement order had been obtained as provided in the PTI Act. Section 17-22-150 of the South Carolina Code, which addresses the disposition of charges against offenders accepted for the pretrial intervention program, requires:

> In the event an offender successfully completes a pretrial intervention program, the solicitor shall effect a noncriminal disposition of the charge or charges pending against the offender. Upon such disposition, the offender may apply to the court for an order to destroy all official records relating to his arrest and no evidence of the

records pertaining to the charge may be retained by any municipal, county, or state entity or any individual, except as otherwise provided in Section 17-22-130. The effect of the order is to restore the person, in the contemplation of the law, to the status he occupied before the arrest. No person as to whom the order has been entered may be held thereafter under any provision of any law to be guilty of perjury or otherwise giving a false statement by reason of his failure to recite or acknowledge the arrest in response to any inquiry made of him for any purpose.

S.C. Code Ann. § 17-22-150(a) (2014). No such order was referenced in the circuit court.

As in *Smalls*, an examination of Durant about the dismissal of her charges, as well as the favorable treatment Husband received when "nobody showed up," would have been appropriate "to show a prototypical form of bias" and expose facts that would allow the jury to "appropriately draw inferences relating to" Durant's credibility. *See State v. Graham*, 314 S.C. 383, 385, 444 S.E.2d 525, 527 (1994) ("[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'" (alterations by court) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986))); *Jones*, 343 S.C. at 571, 541 S.E.2d at 818 (holding the trial court committed a reversible error by refusing to allow defendant to cross-examine witness about past dealings with the solicitor's office because defendant sought "not to impeach [the witness] through those dismissed charges, but rather to expose [his] bias and prejudice in the present case").

Although we find the circuit court erred in limiting Moody's cross-examination of Durant as to the dismissal of her family's charges, our analysis of Jermichael's cross-examination differs. Moody correctly acknowledges that assault convictions are not generally probative of truthfulness; however, he argues he should have nevertheless been able to cross-examine Jermichael about the charge because the dismissal was evidence of bias or a motive to misrepresent under Rule 609(c), SCRE. We disagree. *See State v. Aleksey*, 343 S.C. 20, 34, 538 S.E.2d 248, 255 (2000) (holding trial court did not err in refusing to allow defendant to

cross-examine a witness about nine dismissed indictments for narcotics charges because narcotics offenses were not generally probative of truthfulness *and* the dismissed indictments were not evidence of "bias, prejudice, or any motive to misrepresent" under Rule 609(c)).  As the circuit court noted, Jermichael's assault charge post-dated Moody's arrest and—although we are concerned with the timing of the dismissals for three different witnesses to the pool party events—mindful of our standard of review, we cannot say the circuit court abused its discretion in limiting Moody's cross-examination of Jermichael.

## B.  Specific Instances of Conduct under Rule 608(b), SCRE

Moody next argues the circuit court erroneously prohibited him from cross-examining Durant about her biases—both against him and in favor of the State—resulting from his reporting her to law enforcement for insurance fraud.  Moody further contends evidence of Durant's conduct relating to the insurance fraud was admissible under Rule 608(b), SCRE, as a specific instance of conduct probative of untruthfulness.  We agree.

Rule 608(b), SCRE provides:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

"The inquiry under Rule 608(b) is limited to those specific instances of misconduct which are clearly probative of truthfulness or untruthfulness such as forgery, bribery, false pretenses, and embezzlement."  *State v. Kelsey*, 331 S.C. 50, 75, 502 S.E.2d 63, 75 (1998).

This court has considered whether the PTI Act[8] protects the underlying conduct leading to an arrest in the same manner in which it protects a charge that has been dismissed.  In *State v. Joseph*, this court noted:

> [U]pon successful completion of the PTI program, it is as if the arrest never occurred—the offender is not required to admit to the arrest and the offender's denial of the arrest is, by statute, deemed to be truthful.  It seems clear, then, that it would be error for a court to allow cross-examination about an arrest disposed of through successful completion of the PTI program.
>
> The [PTI] Act, however, *does not extend the same protection to the conduct giving rise to the arrest.*  That is, while the Act provides that the offender may deny that he was arrested, it does not provide that he may deny the conduct leading up to the arrest.  Assuming that the conduct could otherwise be used to impeach the witness, the question is whether the witness's successful completion of the PTI program places the conduct off-limits for purposes of impeachment.

328 S.C. 352, 359, 491 S.E.2d 275, 278 (Ct. App. 1997) (discussing S.C. Code Ann. § 17-22-10 to -170 (1985 & Supp. 1996) (emphasis added)).

Durant was charged with felony conspiracy to commit insurance fraud and breach of trust with fraudulent intent ($2,000–$10,000).  Durant's involvement with Husband's filing a false report with his insurance company—which led to her arrest for breach of trust—involved dishonesty, and such conduct is probative of truthfulness in the same way that acts of forgery, bribery, false pretenses, and embezzlement are probative of truthfulness.  *See Kelsey*, 331 S.C. at 75, 502 S.E.2d at 75 (recognizing that "specific instances of misconduct which are clearly probative of truthfulness or untruthfulness [include] forgery, bribery, false pretenses, and embezzlement").  Durant's participation in such fraudulent activities, as well as the fact that Moody reported her and provided tape recordings to law enforcement, impacted her reliability and potential biases as a witness; thus, Moody should have been permitted to inquire about the conduct and surrounding circumstances.

---

[8] S.C. Code Ann. §§ 17-22-10 to -170 (2014 & Supp. 2018).

Moreover, even if this were a situation in which her completion of PTI protected Durant from being questioned about the actual arrest, Moody would still have been permitted to question her about the underlying conduct leading to the arrest—i.e., the extent of her involvement in filing the false insurance claim.[9] *See Joseph*, 328 S.C. at 359, 491 S.E.2d at 278 (explaining that the PTI Act "does not extend the same protection to the conduct giving rise to the arrest . . . it does not provide that [the witness] may deny the conduct leading up to the arrest").  Thus, we find the circuit court abused its discretion in refusing to allow Moody to cross-examine Durant about her involvement in Husband's false insurance claim, Moody's recording of her confession, and his reporting of her activities to law enforcement.

## II. Harmless Error

Moody argues the circuit court's refusal to allow him to cross-examine Durant about the dismissed charges—and her conduct leading to the charges—was not harmless error.  We disagree.

"A violation of the Confrontation Clause is not per se reversible but is subject to a harmless error analysis." *Gracely*, 399 S.C. at 375, 731 S.E.2d at 886.  "A violation of a defendant's Sixth Amendment right to confront a witness is not per se reversible error if the error is harmless beyond a reasonable doubt." *State v. Curry*, 370 S.C. 674, 680, 636 S.E.2d 649, 652 (Ct. App. 2006).  "Harmless error analyses are fact-intensive inquiries and are not governed by a definite set of rules." *State v. Jenkins*, 412 S.C. 643, 651, 773 S.E.2d 906, 909 (2015).  "Rather, appellate courts must determine the materiality and prejudicial character of the error in relation to the entire case." *Id.* at 651, 773 S.E.2d at 910.

In determining whether an error is harmless, this court considers "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination

---

[9] Although Durant's charges were eligible for expungement at the time of Moody's trial, they had not yet been expunged.  Durant's completion of PTI further differs from that in *Joseph* because there, the issue of the witness's underlying conduct had not been preserved, and the trial court permitted Joseph to cross-examine the witness as to a separate conviction for giving false information to police. *Joseph*, 328 S.C. at 357, 491 S.E.2d at 277.

otherwise permitted, and, of course, the overall strength of the prosecution's case." *See State v. Clark*, 315 S.C. 478, 481, 445 S.E.2d 633, 634 (1994) (quoting *Van Arsdall*, 475 U.S. at 684). However, this list is not exhaustive. *Graham*, 314 S.C. at 386, 444 S.E.2d at 527 ("The list of factors as set out in *Van Arsdall* is not exhaustive.").

"No definite rule of law governs the finding that an error was harmless; rather, the materiality and prejudicial character of the error must be determined from its relationship to the entire case." *Gillian*, 360 S.C. at 454–55, 602 S.E.2d at 73. "In determining whether an error is harmless, the reviewing court must review the entire record to determine what effect the error had on the verdict. Error is harmless beyond a reasonable doubt where it did not contribute to the verdict obtained." *State v. Douglas*, 369 S.C. 424, 432, 632 S.E.2d 845, 849 (2006) (citation omitted). "Engaging in this harmless error analysis, we note that our jurisprudence requires us not to question whether the State proved its case beyond a reasonable doubt, but whether beyond a reasonable doubt the trial error did not contribute to the guilty verdict." *State v. Tapp*, 398 S.C. 376, 389–90, 728 S.E.2d 468, 475 (2012).

Here, Moody admitted he pointed a gun at the Wrights during the altercation. Although Moody argues he felt threatened and pulled the weapon in self-defense and to defend his dogs, abundant evidence belied Moody's contention that he was ever threatened or that anyone—other than a loose dog— trespassed on his property or otherwise approached him before he was on Durant's patio steps. Durant's testimony that no one threatened Moody was cumulative to that of the other attendees at the pool party and was consistent with the statements she gave to law enforcement at the time of the incident.[10] As such, we find the errors committed by the circuit court were harmless.

---

[10] Moody also challenges the circuit court's denying him the opportunity to proffer evidence of Durant's history of mental health issues. Durant's week-long stay in a mental health facility occurred three months after the pool party incident, and Durant testified pretrial that the stress of the incident necessitated the stay. There was no evidence that at the time of trial, Durant's mental health affected her ability "to communicate [her] observations accurately and truthfully at trial." *United States v. Lopez*, 611 F.2d 44, 45–46 (4th Cir. 1979) (noting that to constitute a proper subject for cross-examination, a witness's mental health impairment must have been "at a time probatively related to the time period about which he was attempting to testify[;] must go to the witness'[s] qualification to testify and ability to recall[;] and must not "introduce into the case a collateral issue which would

## III. Remaining Issues

As to the Moody's remaining assertions of error, we affirm pursuant to Rule 220(b), SCACR, and the following authorities:

1. As to Moody's argument that the circuit court erred in denying him immunity under the Protection of Persons and Property Act: *State v. Curry*, 406 S.C. 364, 371, 752 S.E.2d 263, 266 (2013) ("Section 16-11-450 provides immunity from prosecution *if* a person is found to be justified in using deadly force under the Act." (emphasis in original)); *State v. Scott*, 424 S.C. 463, 468, 819 S.E.2d 116, 118 (2018) ("We focus our analysis on self-defense. As we stated in *Curry*, 'Consistent with the Castle Doctrine and the text of the Act, a valid case of self-defense must exist, and the trial court must necessarily consider the elements of self-defense in determining a defendant's entitlement to the Act's immunity.'" (quoting *Curry*, 406 S.C. at 371, 752 S.E.2d at 266)); *id.* at 468–69, 819 S.E.2d at 118 (a defendant "bears the burden of proving these elements by the preponderance of the evidence. The elements are, (1) The defendant was without fault in bringing on the difficulty; (2) The defendant ... actually believed he was in imminent danger of losing his life or sustaining serious bodily injury, or he actually was in such imminent danger; (3) If the defense is based upon the defendant's actual belief of imminent danger, a reasonable prudent man of ordinary firmness and courage would have entertained the same belief ...; and (4) The defendant had no other probable means of avoiding the danger of losing his own life or sustaining serious bodily injury than to act as he did in this particular instance.") (quoting *State v. Dickey*, 394 S.C. 491, 499, 716 S.E.2d 97, 101 (2011)).

---

confuse the jury and which would necessitate allowing the Government to introduce testimony explaining the matter."). Durant's pretrial and trial testimonies were consistent with both her contemporaneous statement to law enforcement at the time of the pool party incident and the statements of the other witnesses at the pool party. Accordingly, we do not believe the trial court abused its discretion in prohibiting Moody from questioning Durant about her mental health. *Cf. State v. Blackwell*, 420 S.C. 127, 153–54, 801 S.E.2d 713, 727 (2017) (noting "the dearth of South Carolina case law" on the issue of confidential mental health records in the Confrontation Clause context and adopting a procedure for trial court review of mental health records "that effectuates the legislative mandates of section 44-22-100 of the South Carolina Code and the constitutional protections of the Confrontation Clause"); S.C. Code § 44-22-100 (2018) (providing for the confidentially of certain treatment records and delineating exceptions thereto).

2. As to Moody's argument that the circuit court erred in declining to instruct the jury on the defense of habitation: *State v. Rye*, 375 S.C. 119, 124, 651 S.E.2d 321, 323 (2007) ("[T]he defense of habitation provides that where one attempts to force himself into another's dwelling, the law permits an owner to use reasonable force to expel the trespasser."); *id.* ("For the defense of habitation to apply, a defendant need only establish that a trespass has occurred and that his chosen means of ejectment were reasonable under the circumstances."); *State v. Lee*, 293 S.C. 536, 537, 362 S.E.2d 24, 25 (1987) ("One defending himself from imminent attack on his own premises is entitled to a charge of defense of habitation."); *State v. Moultrie*, 273 S.C. 532, 534, 257 S.E.2d 730, 731 (1979) ("One element necessary to both self-defense and defense of habitation is that the defendant be without fault in bringing about the difficulty.").

**Conclusion**

For the foregoing reasons, Moody's convictions are

**AFFIRMED.**

**GEATHERS, MCDONALD, and HILL, JJ., concur.**